**FOR PUBLICATION**
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

**FILED**

JUN 12 2017

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| STATE OF HAWAII; ISMAIL ELSHIKH, | No. 17-15589 |
| Plaintiffs-Appellees, | D.C. No. 1:17-cv-00050-DKW-KSC |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; JOHN F. KELLY, in his official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF STATE; REX W. TILLERSON, in his official capacity as Secretary of State; UNITED STATES OF AMERICA, | OPINION |
| Defendants-Appellants. | |

Appeal from the United States District Court
for the District of Hawai‘i
Derrick Kahala Watson, District Judge, Presiding

Argued and Submitted May 15, 2017
Seattle, Washington

Before: Michael Daly Hawkins, Ronald M. Gould, and Richard A. Paez, Circuit Judges.

Per Curiam Opinion

# OPINION[1]

PER CURIAM:

We are asked to delineate the statutory and constitutional limits to the President's power to control immigration in this appeal of the district court's order preliminarily enjoining two sections of Executive Order 13780 ("EO2" or "the Order"), "Protecting the Nation From Foreign Terrorist Entry Into the United States." The Immigration and Nationality Act ("INA") gives the President broad powers to control the entry of aliens, and to take actions to protect the American public. But immigration, even for the President, is not a one-person show. The President's authority is subject to certain statutory and constitutional restraints. We conclude that the President, in issuing the Executive Order, exceeded the scope of the authority delegated to him by Congress. In suspending the entry of more than 180 million nationals from six countries, suspending the entry of all refugees, and reducing the cap on the admission of refugees from 110,000 to 50,000 for the 2017 fiscal year, the President did not meet the essential precondition to exercising his delegated authority: The President must make a sufficient finding that the entry of these classes of people would be "detrimental to the interests of the United States." Further, the Order runs afoul of other provisions of the INA that prohibit

---

[1] We thank the parties and their counsel, as well as the amici, for their excellent briefs and arguments in this case.

2

nationality-based discrimination and require the President to follow a specific process when setting the annual cap on the admission of refugees. On these statutory bases, we affirm in large part the district court's order preliminarily enjoining Sections 2 and 6 of the Executive Order.

# I

## A

One week after inauguration and without interagency review, President Donald J. Trump issued Executive Order 13769 ("EO1"). Exec. Order No. 13769, 82 Fed. Reg. 8977 (Jan. 27, 2017).[2] Entitled "Protecting the Nation From Foreign Terrorist Entry Into the United States," EO1's stated purpose was to "protect the American people from terrorist attacks by foreign nationals admitted to the United States." *Id.* EO1 recited that "[n]umerous foreign-born individuals have been convicted or implicated in terrorism-related crimes since September 11, 2001, including foreign nationals who entered the United States after receiving visitor, student, or employment visas, or who entered through the United States refugee resettlement program." *Id.*

EO1 mandated two main courses of action to assure that the United States remain "vigilant during the visa-issuance process to ensure that those approved for

---

[2] EO1 was a predecessor to Executive Order 13780, which is the subject of the current appeal.

admission do not intend to harm Americans and that they have no ties to terrorism." *Id.* In Section 3, the President invoked his authority under 8 U.S.C. § 1182(f) to suspend for 90 days immigrant and nonimmigrant entry into the United States of nationals from seven majority-Muslim countries: Iraq, Iran, Libya, Sudan, Somalia, Syria, and Yemen. *See id.* at 8978. In Section 5, the President immediately suspended the U.S. Refugee Admissions Program ("USRAP") for 120 days, imposed a ban of indefinite duration on the entry of refugees from Syria, and limited the entry of refugees to 50,000 in fiscal year 2017. *Id.* at 8979. EO1 also ordered that changes be made to the refugee screening process "to prioritize refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual's country of nationality." *Id.* EO1 permitted the Secretaries of State and Homeland Security to make case-by-case exceptions to these restrictions "when in the national interest," and explained that it would be in the national interest "when the person is a religious minority in his country of nationality facing religious persecution." *Id.*

EO1 took immediate effect, causing great uncertainty as to the scope of the order, particularly in its application to lawful permanent residents. Notably, federal officials themselves were unsure as to the scope of EO1, which caused mass confusion at airports and other ports of entry. *See* Brief of the Foundation of

4

Children of Iran and Iranian Alliance Across Borders as Amici Curiae, Dkt. No. 77 at 11–12 (describing how an Iranian visa holder was turned away while en route to the United States because of the confusion regarding the contours of EO1's scope); Brief of Former National Security Officials as Amici Curiae, Dkt. No. 108 at 25 n.53 & 54 (noting confusion at airports because officials were neither consulted nor informed of EO1 in advance).

Shortly after EO1 issued, the States of Washington and Minnesota filed suit in the Western District of Washington to enjoin EO1. On February 3, 2017, the district court granted a temporary restraining order ("TRO"). *Washington v. Trump*, No. C17-0141JLR, 2017 WL 462040 (W.D. Wash. Feb. 3, 2017). On February 4, 2017, the Government filed an emergency motion in our court, seeking a stay of the TRO pending appeal.

On February 9, 2017, this court denied the Government's emergency motion for a stay of the injunction. *Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017) (per curiam), *reconsideration en banc denied*, 853 F.3d 933 (9th Cir. 2017). In so doing, the panel rejected the Government's arguments that EO1 was wholly unreviewable. *See id.* at 1161–64. After determining that the states had standing based on the alleged harms to their proprietary interests, *id.* at 1159–61, this court concluded that the states demonstrated a likelihood of success on their procedural due process claim, at least as to lawful permanent residents and nonimmigrant visa

5

holders, *id.* at 1164–66. The panel did not review the states' other claims, including the statutory-based claims. *Id.* at 1164.

Rather than continue with the litigation, the Government filed an unopposed motion to voluntarily dismiss the underlying appeal after the President signed EO2. On March 8, 2017, this court granted that motion, which substantially ended the story of EO1. The curtain opens next to the present controversy regarding EO2.

**B**

On March 6, 2017, the President issued EO2, also entitled "Protecting the Nation From Foreign Terrorist Entry Into the United States." Exec. Order No. 13780, 82 Fed. Reg. 13209 (Mar. 6, 2017). The revised Order was to take effect on March 16, 2017, at which point EO1 would be revoked. *Id.* at 13218. The Order expressly stated that EO1 "did not provide a basis for discriminating for or against members of any particular religion" and was "not motivated by animus toward any religion." *Id.* at 13210.

Section 2—"Temporary Suspension of Entry for Nationals of Countries of Particular Concern During Review Period"—reinstates the 90-day ban on travel for nationals of six of the seven majority-Muslim countries identified in EO1: Iran, Libya, Somalia, Sudan, Syria, and Yemen. *Id.* at 13213. Section 2 also directs the Secretary of Homeland Security, the Secretary of State, and the Director of National Intelligence to "conduct a worldwide review to identify whether, and if so

6

what, additional information will be needed from each foreign country to adjudicate an application by a national of that country for a visa, admission, or other benefit under the INA (adjudications) in order to determine that the individual is not a security or public-safety threat." *Id.* at 13212. Section 2(c) states in full:

> To temporarily reduce investigative burdens on relevant agencies during the review period described in subsection (a) of this section, to ensure the proper review and maximum utilization of available resources for the screening and vetting of foreign nationals, to ensure that adequate standards are established to prevent infiltration by foreign terrorists, and in light of the national security concerns referenced in section 1 of this order, I hereby proclaim, pursuant to sections 212(f) and 215(a) of the INA, 8 U.S.C. [§§] 1182(f) and 1185(a), that the unrestricted entry into the United States of nationals of Iran, Libya, Somalia, Sudan, Syria, and Yemen would be detrimental to the interests of the United States. I therefore direct that the entry into the United States of nationals of those six countries be suspended for 90 days from the effective date of this order, subject to the limitations, waivers, and exceptions set forth in sections 3 and 12 of this order.

*Id.* at 13213.

> Regarding the six identified countries, EO2 explains:

> Each of these countries is a state sponsor of terrorism, has been significantly compromised by terrorist organizations, or contains active conflict zones. Any of these circumstances diminishes the foreign government's willingness or ability to share or validate important information about individuals seeking to travel to the United States. Moreover, the significant presence in each of these countries of terrorist organizations, their members, and others exposed to those organizations increases the chance that conditions will be exploited to enable terrorist operatives or sympathizers to travel to the United States. Finally, once foreign nationals from these countries are admitted to the United States, it is often difficult to remove them, because many of

7

these countries typically delay issuing, or refuse to issue, travel documents.

*Id.* at 13210. Based on the conditions of these six countries, "the risk of erroneously permitting entry of a national of one of these countries who intends to commit terrorist acts or otherwise harm the national security of the United States is unacceptably high." *Id.* at 13211.

The Order states that it no longer includes Iraq on the list of designated countries because of Iraq's "close cooperative relationship" with the United States and its recent efforts to enhance its travel documentation procedures. *Id.* at 13212. The Order also states that its scope has been narrowed from EO1 in response to "judicial concerns" about the suspension of entry with respect to certain categories of aliens. *Id.* EO2 applies only to individuals outside of the United States who do not have a valid visa as of the issuance of EO1 or EO2. EO2, unlike EO1, expressly exempts lawful permanent residents, dual citizens traveling under a passport issued by a country not on the banned list, asylees, and refugees already admitted to the United States. *See id.* at 13213–14. The Order also provides that consular officers or Customs and Border Protection officials can exercise discretion in authorizing case-by-case waivers to issue visas and grant entry during the suspension period, and offers examples of when waivers "could be appropriate." *See id.* at 13214–15.

Section 6—"Realignment of the U.S. Refugee Admissions Program for

8

Fiscal Year 2017"—suspends USRAP for 120 days. *Id.* at 13215. During this period, the heads of certain executive agencies are directed to review the current USRAP application and adjudication processes, and to determine the additional procedures that "should" be required for individuals seeking admission as refugees. *See id.* at 13215–16. Invoking 8 U.S.C. § 1182(f), Section 6(b) reduces the number of refugees to be admitted from 110,000 to 50,000 in fiscal year 2017. *Id.* at 13216. The Order also removes EO1's preference for refugees facing persecution as a member of a minority religion, and no longer imposes a complete ban on Syrian refugees. Section 6 further provides for discretionary case-by-case waivers. *Id.*

EO2 supplies additional information relevant to national security concerns. The Order includes excerpts from the State Department's 2015 Country Reports on Terrorism, that it asserts demonstrate "why . . . nationals [from the designated countries] continue to present heightened risk to the security of the United States." *Id.* at 13210; *see id.* at 13210–11 (providing a brief description of country conditions for each of the designated countries). The Order states that foreign nationals and refugees have committed acts of terrorism:

> Recent history shows that some of those who have entered the United States through our immigration system have proved to be threats to our national security. Since 2001, hundreds of persons born abroad have been convicted of terrorism-related crimes in the United States. They have included not just persons who came here legally on visas but also individuals who first entered the country as refugees. For example, in

9

January 2013, two Iraqi nationals admitted to the United States as refugees in 2009 were sentenced to 40 years and to life in prison, respectively, for multiple terrorism-related offenses. And in October 2014, a native of Somalia who had been brought to the United States as a child refugee and later became a naturalized United States citizen was sentenced to 30 years in prison for attempting to use a weapon of mass destruction as part of a plot to detonate a bomb at a crowded Christmas-tree-lighting ceremony in Portland, Oregon. The Attorney General has reported to me that more than 300 persons who entered the United States as refugees are currently the subjects of counterterrorism investigations by the Federal Bureau of Investigation.

*Id.* at 13212. EO2 does not discuss any instances of domestic terrorism involving nationals from Iran, Libya, Sudan, Syria, or Yemen.

## C

Two versions of a report from the Department of Homeland Security ("DHS") surfaced after EO1 issued. First, a draft report from DHS, prepared about one month after EO1 issued and two weeks prior to EO2's issuance, concluded that citizenship "is unlikely to be a reliable indicator of potential terrorist activity" and that citizens of countries affected by EO1 are "[r]arely [i]mplicated in U.S.-[b]ased [t]errorism." Specifically, the DHS report determined that since the spring of 2011, at least eighty-two individuals were inspired by a foreign terrorist group to carry out or attempt to carry out an attack in the United States. Slightly more than half were U.S. citizens born in the United States, and the remaining persons were from twenty-six different countries—with the most individuals originating from Pakistan, followed by Somalia, Bangladesh, Cuba, Ethiopia, Iraq, and Uzbekistan.

10

*Id.* Of the six countries included in EO2, only Somalia was identified as being among the "top" countries-of-origin for the terrorists analyzed in the report. During the time period covered in the report, three offenders were from Somalia; one was from Iran, Sudan, and Yemen each; and none was from Syria or Libya. The final version of the report, issued five days prior to EO2, concluded "that most foreign-born, [U.S.]-based violent extremists likely radicalized several years *after* their entry to the United States, [thus] limiting the ability of screening and vetting officials to prevent their entry because of national security concerns" (emphasis added).

The same day EO2 issued, Attorney General Jefferson B. Sessions III and Secretary of Homeland Security John F. Kelly submitted a letter to the President recommending that he "direct[] a temporary pause in entry" from countries that are "unable or unwilling to provide the United States with adequate information about their nationals" or are designated as "state sponsors of terrorism."

**D**

The State of Hawaiʻi ("the State") filed a motion for a TRO seeking to enjoin EO1, which the District of Hawaiʻi did not rule on because of the nationwide TRO entered in the Western District of Washington. After EO2 issued, the State filed an amended complaint challenging EO2 in order "to protect its residents, its employers, its educational institutions, and its sovereignty." Dr.

11

Elshikh, the Imam of the Muslim Association of Hawai'i, joined the State's challenge because the Order "inflicts a grave injury on Muslims in Hawai'i, including Dr. Elshikh, his family, and members of his Mosque." In 2015, Dr. Elshikh's wife filed an I-130 Petition for Alien Relative on behalf of her mother—Dr. Elshikh's mother-in-law—a Syrian national living in Syria. Dr. Elshikh fears that his mother-in-law will not be able to enter the United States if EO2 is implemented. Plaintiffs named as Defendants Donald J. Trump, in his official capacity as President of the United States; the U.S. Department of Homeland Security; John F. Kelly, in his official capacity as Secretary of Homeland Security; the U.S. Department of State; Rex W. Tillerson, in his official capacity as Secretary of State; and the United States of America (collectively referred to as "the Government").

Plaintiffs allege that EO2 suffers similar constitutional and statutory defects as EO1 and claim that the Order violates: the Establishment Clause of the First Amendment; the equal protection guarantees of the Fifth Amendment's Due Process Clause on the basis of religion and/or national origin, nationality, or alienage; the Due Process Clause of the Fifth Amendment based on substantive due process rights; the Due Process Clause of the Fifth Amendment based on procedural due process rights; the Immigration and Nationality Act; the Religious Freedom Restoration Act; and the Administrative Procedure Act. For their INA

12

claim, Plaintiffs specifically contend that EO2 violates the INA by discriminating on the basis of nationality, ignoring and modifying the statutory criteria for determining terrorism-related inadmissibility, and exceeding the President's delegated authority under the INA.[3] Plaintiffs also filed a motion for a TRO along with their amended complaint.

On March 15, 2017, the district court granted the TRO, holding that Plaintiffs had shown a likelihood of success on the merits of their Establishment Clause claim, and entered a nationwide injunction prohibiting enforcement of Sections 2 and 6 of EO2. *See Hawai'i v. Trump*, No. CV 17-00050 DKW-KSC, 2017 WL 1011673 (D. Haw. Mar. 15, 2017) ("*Hawai'i TRO*"). On March 29, 2017, the district court granted Plaintiffs' motion to convert the TRO to a preliminary injunction. *See Hawai'i v. Trump*, No. CV 17-00050 DKW-KSC, 2017 WL 1167383 (D. Haw. Mar. 29, 2017) ("*Hawai'i PI*"). The district court declined to narrow the scope of the injunction, concluding that the entirety of Sections 2 and 6 of the Order ran afoul of the Establishment Clause and that the Government did not provide a workable framework for narrowing the scope of the enjoined conduct. *See id.* at *8. The court entered the following injunction:

> Defendants and all their respective officers, agents, servants, employees, and attorneys, and persons in active concert or participation

---

[3] On appeal, Plaintiffs also contend that EO2 violates the INA because it ignores the codified procedures for setting annual refugee admissions provided in 8 U.S.C. § 1157.

13

with them, are hereby enjoined from enforcing or implementing Sections 2 and 6 of the Executive Order across the Nation. Enforcement of these provisions in all places, including the United States, at all United States borders and ports of entry, and in the issuance of visas is prohibited, pending further orders from this Court.

*Id.* at \*9.

On March 30, 2017, the Government filed a notice of appeal. This court granted the Government's unopposed motion to expedite the case. The Government requests that this court vacate the preliminary injunction, or at least narrow the injunction, and also stay the injunction pending appeal.

## II

The district court held that Plaintiffs were entitled to preliminary relief because they had made a strong showing of success on the merits of their Establishment Clause claim. Applying the secular purpose test from *Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971), and relying on the historical record that contained "significant and unrebutted evidence of religious animus driving the promulgation of the Executive Order," the district court concluded that EO2 was issued with an intent to disfavor people of Islamic faith. *See Hawai'i TRO*, 2017 WL 1011673, at \*12–16. In so doing, the district court decided an important and controversial constitutional claim without first expressing its views on Plaintiffs' statutory claims, including their INA-based claim. *See id.* at \*11 n.11.

The INA claim was squarely before the district court and briefed and argued

14

before this court. Mindful of the Supreme Court's admonition that "courts should be extremely careful not to issue unnecessary constitutional rulings," "[p]articularly where, as here, a case implicates the fundamental relationship between the Branches," we think it appropriate to turn first to the INA claim. *Am. Foreign Serv. Ass'n v. Garfinkel*, 490 U.S. 153, 161 (1989) (per curiam); *accord Lying v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.").

After first determining that Plaintiffs have standing to assert their INA-based statutory claim, we conclude that Plaintiffs have shown a likelihood of success on the merits of that claim and that the district court's preliminary injunction order can be affirmed in large part based on statutory grounds. For reasons further explained below, we need not, and do not, reach the Establishment Clause claim to resolve this appeal. *See Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("[I]f a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter.").

## III

Before turning to our review of Plaintiffs' statutory claim, we first address

15

the Government's challenge to the preliminary injunction order on justiciability grounds. The Government contends both that Plaintiffs lack standing to pursue this case and that the case is not yet ripe. The Government further contends that the consular nonreviewability doctrine bars this court from reviewing EO2. We address each contention in turn.

## A

"Article III of the Constitution limits federal-court jurisdiction to 'Cases' and 'Controversies.'" *Massachusetts v. EPA*, 549 U.S. 497, 516 (2007). "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy" and limits who may "maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). "At this very preliminary stage of the litigation, [Plaintiffs] may rely on the allegations in their [amended complaint] and whatever other evidence they submitted in support of their [preliminary

injunction] motion to meet their burden." *Washington*, 847 F.3d at 1159; *see Lujan*, 504 U.S. at 561.

The district court determined that both the State of Hawaiʻi and Dr. Elshikh have standing to pursue their Establishment Clause claim. *See Hawaiʻi TRO*, 2017 WL 1011673, at *7–10. The Government argues that Plaintiffs fail to satisfy the requirements of Article III standing to bring their Establishment Clause claim. Plaintiffs must establish standing for each of their claims. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). As we do not reach Plaintiffs' Establishment Clause claim, we address only whether Plaintiffs have standing to challenge EO2 based on their INA-based statutory claim and conclude that they do.

**1**

Dr. Elshikh is an American citizen of Egyptian descent. He alleges that EO2 will prevent his mother-in-law from obtaining a visa to reunite with her family. His mother-in-law is a Syrian national currently living in Syria; she last visited her family in Hawaiʻi in 2005 and has not yet met two of her five grandchildren. Dr. Elshikh's wife filed an I-130 Petition for Alien Relative on behalf of her mother in September 2015, and the petition was approved in February 2016. After EO1 issued, Dr. Elshikh was told that his mother-in-law's visa application for an immigrant visa had been put on hold. After EO1 was enjoined, he was notified that the application had progressed to the next stage of the process, and that her

17

interview would be scheduled at an embassy overseas. Dr. Elshikh understandably and reasonably fears that EO2 will prevent his mother-in-law from entering the country.[4] Dr. Elshikh asserts that he has standing based on the barriers EO2 imposes in preventing him from reuniting his mother-in-law with his family.

This court and the Supreme Court have reviewed the merits of cases brought by U.S. residents with a specific interest in the entry of a foreigner. *See, e.g.*, *Kerry v. Din*, 135 S. Ct. 2128, 2131 (2015) (involving a challenge by a U.S. citizen to the denial of her husband's visa); *Kleindienst v. Mandel*, 408 U.S. 753, 756–60 (1972) (addressing a challenge by American professors to the denial of a visa to a journalist they had invited to speak at several academic events); *Cardenas v. United States*, 826 F.3d 1164, 1167 (9th Cir. 2016) (determining that a U.S. citizen could challenge the denial of her husband's visa). Most similar to this case, in *Legal Assistance for Vietnamese Asylum Seekers v. Department of State, Bureau of Consular Affairs*, the D.C. Circuit determined that visa sponsors had standing to assert that the State Department's refusal to process visa applications of

---

[4] Dr. Elshikh also alleges that EO2 results in a disfavored religion in Hawaiʻi and the United States; that the Order communicates to his five children that their own country discriminates against individuals who share their ethnicity and religious beliefs; and that the Order has caused members of the Islamic community in Hawaiʻi, including members of his mosque, to feel that Muslim citizens are targeted because of their religion and national origin. For purposes of determining standing to pursue the INA-based statutory claim, we need not address these aspects of Dr. Elshikh's injury.

Vietnamese citizens living in Hong Kong violated 8 U.S.C. § 1152. 45 F.3d 469, 471–73 (D.C. Cir. 1995), *vacated on other grounds*, 519 U.S. 1 (1996). The court explained that the State Department's actions prolonged the separation of immediate family members, which resulted in injury to the sponsors. *Id.*

Dr. Elshikh seeks to reunite his mother-in-law with his family and similarly experiences prolonged separation from her. By suspending the entry of nationals from the six designated countries, including Syria, EO2 operates to delay or prevent the issuance of visas to nationals from those countries, including Dr. Elshikh's mother-in-law. Dr. Elshikh has alleged a concrete harm because EO2, specifically the operation of Section 2, is a barrier to reunification with his mother-in-law in light of her stalled visa process. *See id.* (holding that U.S. resident sponsors had standing to challenge the State Department's refusal to process visa applications); *Int'l Refugee Assistance Project v. Trump*, — F.3d ——, No. 17-1351, 2017 WL 2273306, at *10 (4th Cir. May 25, 2017) (en banc), *as amended* (May 31, 2017) (identifying prolonged separation between plaintiff and his wife as a concrete harm). That his mother-in-law's visa application process was placed on hold when EO1 took effect, but moved forward when EO1 was enjoined, further shows that Dr. Elshikh's injury is concrete, real, and immediate if EO2 takes effect. Dr. Elshikh has thus alleged a sufficient injury-in-fact. While not challenged by the Government, it is also clear that Dr. Elshikh has established

19

causation and redressability. His injuries are fairly traceable to the Order, satisfying causation, and enjoining EO2 will remove a barrier to reunification and redress that injury, satisfying redressability.

Dr. Elshikh has met the requirements for constitutional standing with respect to the INA-based statutory claim.

**2**

The State of Hawaiʻi alleges two primary theories of harm in asserting its standing: harm to its proprietary interests and impairment of its sovereign interests.

"[L]ike other associations and private parties, a State is bound to have a variety of proprietary interests. A State may, for example, own land or participate in a business venture." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982). "And like other such proprietors [the State] may at times need to pursue those interests in court." *Id.* at 601–02.

The State asserts that it has standing because of the injuries inflicted on its university. The University of Hawaiʻi ("the University"), which the State operates, has twenty-three graduate students, at least twenty-nine visiting faculty members, and other permanent faculty members from the six countries designated in EO2. The State asserts that EO2 constrains the University's ability to recruit and enroll undergraduate and graduate students, and recruit and hire visiting faculty from the affected countries. The State also contends that EO2 threatens the University's

20

ability to fulfill its educational mission by hampering recruitment of diverse students, preventing scholars from considering employment at the University, dissuading current professors and scholars from continuing their scholarship at the University, hindering the free flow of ideas, and harming its values of inclusiveness and tolerance.

Given the timing of the admissions cycle and this litigation, the State concedes that it is too soon to determine the full impact on recruitment, but asserts that individuals who are not current visa holders or lawful permanent residents would be precluded from considering the University. In its opposition brief, the State gave updated information, explaining that eleven graduate students from the countries affected by the Order have been admitted, and the University was still considering applications from twenty-one other affected applicants. After the case was submitted, Plaintiffs supplemented the record with further updates on the University's admissions cycle.[5] At least three graduate students, each from one of the six designated countries, have accepted their offers of admission and have committed to attending the University. There are eleven graduate student applicants, each from one of the six designated countries, with pending offers of admission for the 2017–18 school year. University classes begin on August 21,

---

[5] The Government did not oppose Plaintiffs' motion for leave to supplement the record, and we granted the motion.

21

2017, but at least two of the students who have accepted their offers of admission must be present on campus by August 1, 2017 and August 10, 2017, respectively, for their graduate programs. The State further explains that if EO2 takes effect now, these students' ability to obtain visas will be impeded.

Before Plaintiffs supplemented the record, the Government argued that the State had not identified any prospective student or faculty member who wished to enter the country *during* Section 2(c)'s 90-day period. However, the State's alleged harm is that EO2 *presently* constrains their recruitment efforts for students and faculty, and that EO2 deters prospective students and faculty members. Given the short admissions cycle—from when the University offers admissions to when international students must decide whether to attend—and the uncertainty of whether EO2 will inhibit their ability to secure a visa before the fall semester begins, EO2's deterrent effect is an injury that is "concrete" and "imminent," as opposed to merely "speculative." *See Lujan*, 504 U.S. at 560–61 (internal quotation marks omitted). Of course, a student who is not permitted to obtain a visa and enter our country would not accept an offer of admission.

The Government next contends that Plaintiffs cannot rely on events that unfolded after the filing of the complaint to establish standing. This argument is not persuasive. The State had previously contended that its recruitment was constrained by EO2 and its supplemental declaration merely provides greater detail

regarding the students who may be unable to join the academic community this fall if EO2 takes effect. We consider the supplemental information as further evidence that EO2 will harm the State because students affected by Section 2(c) may not attend the University, and the University will lose tuition and educational benefits.

The State's standing can thus be grounded in its proprietary interests as an operator of the University. EO2 harms the State's interests because (1) students and faculty suspended from entry are deterred from studying or teaching at the University; and (2) students who are unable to attend the University will not pay tuition or contribute to a diverse student body. *See Washington*, 847 F.3d at 1161 (holding that states, as operators of universities, had Article III standing to challenge EO1 based on harms to their proprietary interests); *Texas v. United States*, 809 F.3d 134, 155–63 (5th Cir. 2015), *as revised* (Nov. 25, 2015), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016) (holding that the state of Texas had standing to challenge the Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") program based on its alleged injury of subsidizing driver's licenses to DAPA beneficiaries). We further conclude that the State has shown that its injury is fairly traceable to EO2 and that enjoining EO2 would redress its harm.

The State also presents an alternative standing theory: that the Order impairs its sovereign interests in carrying out its refugee policies, among other things. A

23

state has an interest in its "exercise of sovereign power over individuals and entities within the relevant jurisdiction," which "involves the power to create and enforce a legal code." *Alfred L. Snapp & Son*, 458 U.S. at 601. The State contends that EO2 hinders the exercise of its sovereign power to enforce its laws and policies and this inflicts an injury sufficient to provide the State standing to challenge the Order. The State has laws protecting equal rights, barring discrimination, and fostering diversity. *See, e.g.*, Haw. Const. art. 1, §§ 2, 5; Haw. Rev. Stat. §§ 489-3, 515-3. Specific to refugees, the State created the Office of Community Services ("OCS"), which is directed to "[a]ssist and coordinate the efforts of all public and private agencies providing services which affect the disadvantaged, refugees, and immigrants." Haw. Rev. Stat. § 371K-4. OCS operates multiple programs for refugees.

The State has resettled three refugees this fiscal year, and at least twenty since 2010. EO2 would prevent the State from assisting with refugee resettlement and thus prevent it from effectuating its policies aimed at assisting refugee and immigrant populations. *See id.* The State's requested injunctive relief would permit it to assist in the resettlement of refugees, at least through fiscal year 2017. As the State exercises "sovereign power over individuals and entities within the relevant jurisdiction" in administering OCS, we conclude, at this preliminary stage, that the State has made sufficient allegations to support standing to challenge the

24

refugee-related provisions of EO2. *See Alfred L. Snapp & Son*, 458 U.S. at 601;

*see also Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 269 (4th Cir. 2011)

(collecting cases where state was found to possess sovereign standing based on

state statutes that regulated behavior or provided for the administration of a state

program).

Concluding that Dr. Elshikh and the State have satisfied Article III's

standing requirements,[6] we turn to whether Plaintiffs are within the "zone of

interests" protected by the INA.

**3**

Because Plaintiffs allege a statutory claim, we must determine whether they

meet the requirement of having interests that "fall within the zone of interests

protected by the law invoked." *Lexmark Int'l, Inc. v. Static Control Components,

Inc.*, 134 S. Ct. 1377, 1388 (2014) (internal quotation marks omitted).

We have little trouble determining that Dr. Elshikh is within the zone of

interests of the INA to challenge EO2 based on this statutory claim. He asserts that

the travel ban prevents his mother-in-law from reuniting with his family. *See*

---

[6] The State has asserted other proprietary interests, including the loss of tourism revenue. The State also appears to present a standing theory based on its quasi-sovereign interests, as *parens patriae*, to secure its residents from the harmful effects of discrimination. We do not reach these arguments because we conclude that the State's proprietary interests, as an operator of the University of Hawaiʻi, and its sovereign interests, in carrying out its refugee programs and policies, are sufficient to confer standing. *See Washington*, 847 F.3d at 1161 n.5.

*Legal Assistance for Vietnamese Asylum Seekers*, 45 F.3d at 471–72 ("The INA authorizes the immigration of family members of United States citizens and permanent resident aliens. In originally enacting the INA, Congress implemented the underlying intention of our immigration laws regarding the preservation of the family unit. Given the nature and purpose of the statute, the resident appellants fall well within the zone of interest Congress intended to protect." (internal quotation marks, citations, and alterations omitted)).

Likewise, the State's efforts to enroll students and hire faculty members who are nationals from the six designated countries fall within the zone of interests of the INA. The INA makes clear that a nonimmigrant student may be admitted into the United States. *See* 8 U.S.C. § 1101(a)(15)(F) (identifying students qualified to pursue a full course of study); 8 C.F.R. § 214.2(f) (providing the requirements for nonimmigrant students, including those in colleges and universities). The INA also provides that nonimmigrant scholars and teachers may be admitted into the United States. *See, e.g.*, 8 U.S.C. § 1101(a)(15)(J) (identifying students, scholars, trainees, teachers, professors, research assistants, specialists, or leaders in fields of specialized knowledge or skill); *id.* § 1101(a)(15)(H) (identifying aliens coming to perform services in a specialty occupation); *id.* § 1101(a)(15)(O) (identifying aliens with extraordinary abilities in the sciences, arts, education, business, or athletics). International students and visiting faculty may qualify for F-1 visas, J-1

visas, H-1B visas, or O-1 visas. *See* Directory of Visa Categories, U.S. Dep't of State, https://travel.state.gov/content/visas/en/general/all-visa-categories.html (last visited June 6, 2017). The INA leaves no doubt that the State's interests in student- and employment-based visa petitions for its students and faculty are related to the basic purposes of the INA.

The State's interest in effectuating its refugee resettlement policies and programs also falls within the zone of interests protected by the INA. *See* 8 U.S.C. § 1101(a)(42) (defining "refugees"); *id.* § 1157 (providing the procedure for determining the number of refugee admissions). These provisions of the INA were amended to provide a "systematic procedure" for the admission of refugees into the United States, as well as "uniform provisions for the effective resettlement and absorption of those refugees who are admitted." Refugee Act of 1980, Pub. L. No. 96-212, § 101, 94 Stat. 102 (1980). The State argues that EO2 upsets this finely-tuned system devised by Congress.

We conclude that Plaintiffs' claims of injury as a result of the alleged statutory violations are, at the least, "*arguably* within the zone of interests" that the INA protects.[7] *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1303

---

[7] The Government also argues that third party prudential standing limitations counsel against this court deciding Plaintiffs' Establishment Clause claim. To the extent this argument applies to Plaintiffs' INA-based statutory claim, we reject it because Plaintiffs have shown that they have suffered injuries as a result of EO2.

27

(2017) (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)).

Plaintiffs have standing to assert their INA-based statutory claim that EO2 exceeds the scope of the President's authority under the INA and conflicts with various INA provisions.

**B**

The Government next argues that Plaintiffs' claims are speculative and not ripe. "Ripeness is peculiarly a question of timing, designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1122 (9th Cir. 2009) (internal quotations marks and alteration omitted). "Our role is neither to issue advisory opinions nor to declare rights in hypothetical cases, but to adjudicate live cases or controversies consistent with the powers granted the judiciary in Article III of the Constitution." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000).

We are unpersuaded by the Government's arguments that *until* a student or faculty member requests a waiver and it is denied, or *until* Dr. Elshikh's mother-in-law requests a waiver and she is denied,[8] Plaintiffs injuries are not ripe because

_____

[8] The Government needlessly argues that travel conditions in Syria make it speculative that Dr. Elshikh's mother-in-law would have made her application

they assume "contingent future events that may not occur." *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotation marks omitted)).

Although the waiver may, in theory, provide students, visiting faculty members, or Dr. Elshikh's mother-in-law an opportunity to obtain visas, the waiver is discretionary. Indeed, no one can count on it. The Order poses hardships to nationals from the six designated countries by barring throughout the suspension period their ability to obtain visas. The waiver provision neither guarantees that waivers will be granted nor provides a process for applying for a waiver; moreover, the ultimate decision is clearly committed to a consular officer's discretion. *See* 82 Fed. Reg. at 13214 ("Case-by-case waivers *could be appropriate* in circumstances such as the following . . . .") (emphasis added); *id.* at 13219 (stating that nothing in the Order provides any "enforceable" rights). The discretionary waiver is not "a sufficient safety valve," *Washington*, 847 F.3d at 1169, and is a far cry from the "contingent future" argued by the Government. Here, nationals from the six designated countries, including Dr. Elshikh's mother-in-law and students who have accepted, or been offered, admission to the University of Hawaiʻi, are burdened by EO2 because they are not permitted entry,

---

interview scheduled for May 24, 2017. This argument does not diminish Dr. Elshikh's argument that the Order's suspension of entry of nationals from the six designated countries creates a significant obstacle to reuniting his mother-in-law with him and his family.

29

and whether they might obtain a waiver is speculative and at the discretion of a consular officer or a Customs and Border Protection official. *See* 82 Fed. Reg. at 13214.

We decline the Government's invitation to wait until Plaintiffs identify a visa applicant who was denied a discretionary waiver to assess whether Plaintiffs have shown a likelihood of success on the merits of their claims. Regardless of whether Dr. Elshikh's mother-in-law or the University's prospective students and faculty members might conceivably obtain such a waiver, they will face substantial hardship if we were to first require that they try to obtain a waiver before we will consider their case. *Cf. Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967). We conclude that the claim is ripe for review.

## C

Finally, the Government renews the argument it made before this court in *Washington v. Trump* that we may not review EO2 because the consular nonreviewability doctrine counsels that the decision to issue or withhold a visa is not subject to judicial review. *See Li Hing of Hong Kong, Inc. v. Levin*, 800 F.2d 970, 971 (9th Cir. 1986) ("[I]t has been consistently held that the consular official's decision to issue or withhold a visa is not subject either to administrative or judicial review."). We reject this argument.

Plaintiffs do not seek review of an individual consular officer's decision to

grant or to deny a visa pursuant to valid regulations, which could implicate the consular nonreviewability doctrine. Plaintiffs instead challenge "the President's *promulgation* of sweeping immigration policy." *Washington*, 847 F.3d at 1162. Courts can and do review both constitutional and statutory "challenges to the substance and implementation of immigration policy." *Id.* at 1163; *see, e.g.*, *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 187–88 (1993) (addressing the merits of a challenge that an executive order violated the INA and the United Nations Convention Relating to the Status of Refugees); *INS v. Chadha*, 462 U.S. 919, 940–41 (1983) (addressing whether a section of the INA that authorized one House of Congress to invalidate a decision of the Executive to allow a deportable alien to remain in the United States was unconstitutional).

This case is justiciable because Plaintiffs seek judicial review of EO2, contending that EO2 exceeds the statutory authority delegated by Congress and constitutional boundaries. "This is a familiar judicial exercise." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012). We reject the Government's argument that the Order is not subject to judicial review. Although "[t]he Executive has broad discretion over the admission and exclusion of aliens, [] that discretion is not boundless. It extends only as far as the statutory authority conferred by Congress and may not transgress constitutional limitations. It is the duty of the courts, in cases properly before them, to say where those statutory and

constitutional boundaries lie." *Abourezk v. Reagan*, 785 F.2d 1043, 1061 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1 (1987).

Whatever deference we accord to the President's immigration and national security policy judgments does not preclude us from reviewing the policy at all. *See Rostker v. Goldberg*, 453 U.S. 57, 70 (1981) ("[D]eference does not mean abdication."); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010) ("Our precedents, old and new, make clear that concerns of national security and foreign relations do not warrant abdication of the judicial role.").

We do not abdicate the judicial role, and we affirm our obligation "to say what the law is" in this case. *Marbury v. Madison*, 5 U.S. 137, 177 (1803). We turn to the merits of the appeal of the preliminary injunction order.

## IV

## A

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id.* at 20. We may affirm the district court's entry of the

preliminary injunction "on any ground supported by the record." *Enyart v. Nat'l Conference of Bar Exam'rs, Inc.*, 630 F.3d 1153, 1159 (9th Cir. 2011).

**B**

We consider whether Plaintiffs are entitled to preliminary relief based on the likelihood that EO2 violates the INA.[9] First, we address whether the President complied with the conditions set forth in § 1182(f), which are necessary for invoking his authority. We next address the conflicts between EO2 and other provisions of the INA.

**1**

Under Article I of the Constitution, the power to make immigration laws "is entrusted exclusively to Congress." *Galvan v. Press*, 347 U.S. 522, 531 (1954); *see* U.S. Const. art. I, § 8, cl. 4 ("The Congress shall have Power . . . [t]o establish an uniform Rule of Naturalization . . . ."); *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) ("[O]ver no conceivable subject is the legislative power of Congress more

---

[9] This claim looks at whether the President appropriately exercised his authority under § 1182(f) by satisfying its precondition, and whether, and to what extent, his authority under § 1182(f) is cabined by other provisions of the INA. Because this challenge does not look at whether "the Executive exercises this [delegated and conditional exercise of] power *negatively*," *Mandel*, 408 U.S. at 770 (emphasis added), nor involves a constitutional challenge by a citizen to a visa denial on the basis of congressionally enumerated standards, *id.* at 769–70, but rather looks at whether the President exceeded the scope of his delegated authority, we do not apply *Mandel*'s "facially legitimate and bona fide reason," *id.*, standard. *See Sale*, 509 U.S. at 166–77 (reviewing whether the executive order complied with the INA without reference to *Mandel*'s standard).

complete than it is over the admission of aliens." (internal quotation marks

omitted)); *id.* at 796 ("The conditions of entry for every alien, the particular classes

of aliens that shall be denied entry altogether, the basis for determining such

classification . . . have been recognized as matters solely for the responsibility of

the Congress . . . ." (internal quotation marks omitted)).

In the INA of 1952, Congress delegated some of its power to the President

through Section 212(f), which provides:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f).

In Section 2(c) of the Order, the President invokes this power along with

§ 1185(a)[10] to suspend for 90 days the entry of nationals from the six designated

---

[10] Section 1185(a)(1) states:

> Unless otherwise ordered by the President, it shall be unlawful—
> (1) for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe[.]

8 U.S.C. § 1185(a)(1). The Government does not argue that § 1185(a)(1) provides an independent basis for the suspension of entry. Because, here, this section does not grant the President a meaningfully different authority than § 1182(f), and

34

countries. *See* 82 Fed. Reg. at 13213. In Section 6(a) of the Order, the President invokes neither section to suspend travel of refugees and to suspend decisions on applications for refugee status for 120 days, but, in Section 6(b), the President invokes § 1182(f) to cap refugee admissions at 50,000 for the 2017 fiscal year. *Id.* at 13215–16.

The parties dispute whether EO2 falls clearly within the President's congressionally delegated authority. To be sure, § 1182(f) gives the President broad authority to suspend the entry of aliens or classes of aliens. However, this authority is not unlimited. *Cf. Kent v. Dulles*, 357 U.S. 116, 129 (1958) ("[I]f that power is delegated, the standards must be adequate to pass scrutiny by the accepted tests."); *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928) ("[L]egislative action is not a forbidden delegation of legislative power" if Congress provides an "intelligible principle to which the person or body authorized . . . is directed to conform."). Section 1182(f) requires that the President *find* that the entry of a class of aliens into the United States *would be detrimental* to the interests of the United States.[11] This section requires that the

_____

because § 1182(f) specifically provides for the President's authority to suspend entry, our analysis proceeds under § 1182(f), understanding that the "reasonable rules, regulations, and orders" the President prescribes would need to, at a minimum, align with the President's authority under § 1182(f).

[11] We construe the term "detrimental" to have its common-sense, dictionary definition. Detrimental is defined as "causing loss or damage; harmful, injurious,

35

President's findings support the conclusion that entry of all nationals from the six designated countries, all refugees, and refugees in excess of 50,000 would be harmful to the national interest. There is no sufficient finding in EO2 that the entry of the excluded classes would be detrimental to the interests of the United States.

**i**

Section 2(c) declares that "the unrestricted entry into the United States of nationals of Iran, Libya, Somalia, Sudan, Syria, and Yemen would be detrimental to the interests of the United States" and directs that the entry of nationals from those designated countries be barred for 90 days. 82 Fed. Reg. at 13213. The provision bans more than 180 million people from entry based on their national origin, including nationals who may have never been physically present in those countries. *See* Brief of Former National Security Officials as Amici Curiae, Dkt. No. 108 at 17. Section 2(c) states:

> [1] To temporarily reduce investigative burdens on relevant agencies during the review period [of the United States' vetting procedures], [2] to ensure the proper review and maximum utilization of available resources for the screening and vetting of foreign nationals, [3] to ensure that adequate standards are established to prevent infiltration by foreign terrorists, and [4] in light of the national security concerns referenced in section 1 of this order, I hereby proclaim, pursuant to sections 212(f) and 215(a) of the INA, 8 U.S.C. [§§] 1182(f) and 1185(a), that the unrestricted entry into the United States of nationals

---

hurtful." *Detrimental*, Oxford English Dictionary, http://www.oed.com/view/Entry/51332?redirectedFrom=detrimental#eid. Throughout the opinion, in addition to the term "detrimental," we also use its synonyms "harmful" and "injurious."

of Iran, Libya, Somalia, Sudan, Syria, and Yemen would be detrimental to the interests of the United States. I therefore direct that the entry into the United States of nationals of those six countries be suspended.

82 Fed. Reg. at 13213. The Government explains that the Order's objective "is to address the risk that potential terrorists might exploit possible weaknesses in the Nation's screening and vetting procedures while the review of those procedures is underway."

We reject the first three reasons provided in Section 2(c) because they relate to preservation of government resources to review existing procedures and ensure adequate vetting procedures. There is no finding that present vetting standards are inadequate, and no finding that absent the improved vetting procedures there likely will be harm to our national interests. These identified reasons do not support the conclusion that the entry of nationals from the six designated countries would be harmful to our national interests.

We turn to the fourth reason—national security concerns—and examine whether it confers a legally sufficient basis for the President's conclusion that the nationality-based entry restriction is warranted. Section 1(d) of the Order explains that nationals from Iran, Libya, Somalia, Sudan, Syria, and Yemen warrant additional scrutiny because:

> Each of these *countries* is a state sponsor of terrorism, has been significantly compromised by terrorist organizations, or contains active conflict zones. Any of these circumstances diminishes the foreign government's willingness or ability to share or validate important

37

information about individuals seeking to travel to the United States. Moreover, the significant presence in each of these *countries* of terrorist organizations, their members, and others exposed to those organizations increases the chance that conditions will be exploited to enable terrorist operatives or sympathizers to travel to the United States. Finally, once foreign nationals from these countries are admitted to the United States, it is often difficult to remove them, because many of these *countries* typically delay issuing, or refuse to issue, travel documents.

*Id.* at 13210 (emphasis added).

Because of these country conditions, the Order concludes that "the risk of erroneously permitting entry of a national of one of these countries who intends to commit terrorist acts or otherwise harm the national security of the United States is unacceptably high." *Id.* at 13211. The Order further indicates that "hundreds of persons born abroad have been convicted of terrorism-related crimes in the United States[,]" but does not identify the number of nationals from the six designated countries who have been so convicted.[12] *See id.* at 13212.

The Order makes no finding that nationality alone renders entry of this broad class of individuals a heightened security risk to the United States. *See Int'l*

---

[12] Amicus Cato Institute explains that over the past decade and a half, only twenty-six nationals from the six designated countries have been convicted for any kind of terrorism offense, and that only four nationals from the six designated countries have been convicted of attempting or plotting a terrorist attack in the United States in that time frame. Brief of the Cato Institute as Amicus Curiae, Dkt. No. 170 at 11–12. Since the September 11, 2001 attacks, twelve people have succeeded in carrying out fatal domestic terrorist attacks—none committed by nationals from the six designated countries in EO2. *See* Brief of Foundation of Children of Iran and Iranian Alliance Across Borders as Amici Curiae, Dkt. No. 77 at 23.

*Refugee Assistance Project*, 2017 WL 2273306, at \*31 (Keenan, J., concurring in part and concurring in the judgment) ("[T]he Second Executive Order does not state that any *nationals* of the six identified countries, *by virtue of their nationality*, intend to commit terrorist acts in the United States or otherwise pose a detriment to the interests of the United States.").

The Order does not tie these nationals in any way to terrorist organizations within the six designated countries. It does not identify these nationals as contributors to active conflict or as those responsible for insecure country conditions. It does not provide any link between an individual's nationality and their propensity to commit terrorism or their inherent dangerousness.[13] In short,

---

[13] Former Presidents have invoked § 1182(f) under non-exigent circumstances to address compromised security conditions abroad but have tied exclusions to the culpable conduct of barred aliens, such as aliens who contributed to a country's situation in a specified way or were members of particular narrowly defined and/or dangerous groups. *See* Kate M. Manuel, *Executive Authority to Exclude Aliens: In Brief* 6–10, Congressional Research Service (2017) (listing categories of aliens excluded under 8 U.S.C. § 1182(f)); *see also* 9 *Foreign Affairs Manual* § 302.14-3(B)(1)(b) (2016), https://fam.state.gov/FAM/09FAM/09FAM030214.html (stating that executive orders issued under § 1182(f) have typically applied to "individuals"; have sometimes been "based on affiliation"; and otherwise have suspended entry "based on objectionable conduct"); Brief of Former Federal Immigration and Homeland Security Officials as Amici Curiae, Dkt. No. 176 at 18–19 ("None of the Executive actions cited elsewhere by the Government, nor any others known to amici, invoked § 1182(f) to suspend entry from one or more countries based on the assumption that nationals from those countries were inherently dangerous." (footnotes omitted)). President Obama's Executive Order 13726, for example, suspended the entry into the United States of persons who

39

the Order does not provide a rationale explaining why permitting entry of nationals from the six designated countries under current protocols would be detrimental to the interests of the United States.[14]

were responsible or complicit in particular actions or policies that threaten the stability of Libya. *See* 81 Fed. Reg. 23559 (Apr. 19, 2016).

In two instances, former Presidents have distinguished classes of aliens on the basis of nationality. But these distinctions were made not because of a particular concern that entry of the individuals themselves would be detrimental, but rather, as retaliatory diplomatic measures responsive to government conduct directed at the United States. For example, President Carter's proclamation barring the future entry of Iranians occurred during the exigent circumstance of the Iranian hostage crisis. This was one of many sanctions imposed to increase political pressure on the Iranian government to ensure the safe return of American hostages. *See* Exec. Order 12172, 44 Fed. Reg. 67947 (Nov. 26, 1979), *amended by* Exec. Order 12206, 45 Fed. Reg. 24101 (Apr. 7, 1980); President Jimmy Carter, *Sanctions Against Iran Remarks Announcing U.S. Actions*, The American Presidency Project (Apr. 7, 1980), http://www.presidency.ucsb.edu/ws/?pid=33233%20. President Reagan's suspension of entry of certain Cuban nationals as immigrants came as a response to the Cuban government's own suspension of "all types of procedures regarding the execution" of an immigration agreement between the United States and Cuba, which had "disrupt[ed] normal migration procedures between the two countries." *See* Proclamation No. 5517, 51 Fed. Reg. 30470 (Aug. 22, 1986).

[14] Indeed, the President recently confirmed his assessment that it is the "countries" that are inherently dangerous, rather than the 180 million individual nationals of those countries who are barred from entry under the President's "travel ban." *See* Donald J. Trump (@realDonaldTrump), Twitter (June 5, 2017, 6:20 PM), https://twitter.com/realDonaldTrump/status/871899511525961728 ("That's right, we need a TRAVEL BAN for certain DANGEROUS countries, not some politically correct term that won't help us protect our people!") (emphasis in original); *see also* Elizabeth Landers, White House: Trump's tweets are "official statements", CNN (June 6, 2017, 4:37 PM), http://www.cnn.com/2017/06/06/politics/trump-tweets-official-statements/ (reporting the White House Press Secretary's confirmation that the President's tweets are "considered official statements by the President of the United States").

The Order's discussion of country conditions fails to bridge the gap. Indeed, its use of nationality as the sole basis for suspending entry means that nationals without significant ties to the six designated countries, such as those who left as children or those whose nationality is based on parentage alone, should be suspended from entry. Yet, nationals of other countries who do have meaningful ties to the six designated countries—and may be contributing to the very country conditions discussed—fall outside the scope of Section 2(c). Consequently, EO2's focus on nationality "could have the paradoxical effect of barring entry by a Syrian national who has lived in Switzerland for decades, but not a Swiss national who has immigrated to Syria during its civil war." *Hawai'i TRO*, 2017 WL 1011673, at *15 (internal quotation marks and alterations omitted); *see also* Brief of the Cato Institute as Amicus Curiae, Dkt. No. 170 at 14–15 (providing statistics on nationals of the designated countries living in other countries as migrants, refugees, or asylum seekers and explaining that Syrian and Iranian nationals do not gain nationality by virtue of their place of birth).

Although the Order explains that country conditions in the six designated countries lessen their governments' ability to share information about nationals seeking to travel to our country, the Order specifically avoids making any finding

---

We take judicial notice of President Trump's statement as the veracity of this statement "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).

that the current screening processes are inadequate. As the law stands, a visa applicant bears the burden of showing that the applicant is eligible to receive a visa or other document for entry and is not inadmissible. *See* 8 U.S.C. § 1361. The Government already can exclude individuals who do not meet that burden. *See id.* The Order offers no further reason explaining how this individualized adjudication process is flawed such that permitting entry of an entire class of nationals is injurious to the interests of the United States.

Finally, the Order relies on 8 U.S.C. § 1187(a)(12) to explain why the six countries have been designated. 82 Fed. Reg. at 13210. In § 1187(a)(12), Congress prevented use of the Visa Waiver Program by dual nationals of, or those who have visited in the last six years, (1) Iraq and Syria, (2) any country designated by the Secretary of State as a state sponsor of terrorism, and (3) any other country designated as a country of concern by the Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence. Rather than setting an outright ban on entry of nationals from these countries, Congress restricted access to the tourist Visa Waiver Program and instead required that persons who are nationals of or have recently traveled to these countries enter the United States with a visa. This provision reflects Congress's considered view on similar security concerns that the Order seeks to address. *See Chadha*, 462 U.S. at 951, 959 (explaining that our founders "consciously" chose to

place the legislative process in the hands of a "deliberate and deliberative" body). The Order identifies no new information to justify Section 2(c)'s blanket ban as contrasted with § 1187(a)(12)'s restriction from the Visa Waiver Program. Moreover, relying on § 1187(a)(12) alone, which requires that aliens from these countries undergo vetting through visa procedures, does not explain why their *entry* would be detrimental to the interests of the United States. To the contrary, it effectively negates the Order's statement of detriment—that the "*unrestricted* entry into the United States of nationals [of the six designated countries] would be detrimental to the interests of the United States." 82 Fed. Reg. at 13213 (emphasis added). Section 1187(a)(12) dictates that the entry of individuals covered by the Order is never "unrestricted."

In conclusion, the Order does not offer a sufficient justification to suspend the entry of more than 180 million people on the basis of nationality. National security is not a "talismanic incantation" that, once invoked, can support any and all exercise of executive power under § 1182(f). *United States v. Robel*, 389 U.S. 258, 263–64 (1967); *see also Korematsu v. United States*, 323 U.S. 214, 235 (1944) (Murphy, J., dissenting) ("[T]he exclusion order necessarily must rely for its reasonableness upon the assumption that all persons of Japanese ancestry may have a dangerous tendency to commit sabotage and espionage and to aid our Japanese enemy in other ways. It is difficult to believe that reason, logic or

experience could be marshalled in support of such an assumption."). Section 1182(f) requires that the President exercise his authority only after meeting the precondition of finding that entry of an alien or class of aliens *would be* detrimental to the interests of the United States. Here, the President has not done so.

**ii**

Section 6(a) suspends travel of refugees into the United States under USRAP and suspends decisions on applications for refugee status for 120 days but does not specifically announce that the entry of refugees would be detrimental to the interests of the United States. 82 Fed. Reg. at 13215.

Assuming the President also relied on § 1182(f) to suspend USRAP for 120 days, EO2 provides the following information to possibly support the conclusion that refugee admissions would injure the national interest. First, EO2 explains that the screening and vetting procedures associated with USRAP "play a crucial role in detecting foreign nationals who may commit, aid, or support acts of terrorism and in preventing those individuals from entering the United States," and that it is the policy of the United States to improve screening and vetting procedures associated with USRAP. *Id.* at 13209. Section 1(h) cites two examples of refugees who have been convicted of terrorism-related crimes in the United States:

> [1] [I]n January 2013, two Iraqi nationals admitted to the United States as refugees in 2009 were sentenced to 40 years and to life in

44

prison, respectively, for multiple terrorism-related offenses.[15]
[2] [I]n October 2014, a native of Somalia who had been brought to the United States as a child refugee and later became a naturalized United States citizen was sentenced to 30 years in prison for attempting to use a weapon of mass destruction . . . .[16]

82 Fed. Reg. at 13212. Section 1(h) also explains that there are "more than 300 persons who entered the United States as refugees [who] are currently the subjects of counterterrorism investigations by the Federal Bureau of Investigation." *Id.*

EO2 does not reveal any threat or harm to warrant suspension of USRAP for 120 days and does not support the conclusion that the entry of refugees in the interim time period would be harmful. Nor does it provide any indication that present vetting and screening procedures are inadequate.[17] Instead, EO2 justifies

---

[15] These two Iraqi nationals pleaded guilty to federal terrorism charges for engaging in terrorism against Americans overseas and providing material support to foreign terrorists and did not face charges for planning a domestic terrorist attack. *See* Press Release: Former Iraqi Terrorists Living in Kentucky Sentenced for Terrorist Activities, U.S. Dep't of Justice, https://www.justice.gov/opa/pr/former-iraqi-terrorists-living-kentucky-sentenced-terrorist-activities (Jan. 29, 2013) (last visited June 6, 2017).

[16] This Somali national entered the United States at the age of three in approximately 1994; the conduct underlying his conviction occurred in 2010 when he was nineteen years old. *See United States v. Mohamud*, 843 F.3d 420, 423 (9th Cir. 2016). His background is consistent with DHS's report that most foreign-born, U.S.-based violent extremists are "likely radicalized several years *after* their entry to the United States," thus "limiting the ability of screening and vetting officials to prevent their entry because of national security concerns" (emphasis added).

[17] Refugees receive the most thorough vetting of all travelers to the United States in a process that takes eighteen to twenty-four months. By the time refugees are approved for resettlement in the United States, they have been reviewed by the

45

the 120-day suspension as a review period of USRAP application and adjudication processes. 82 Fed. Reg. at 13215. The Government reiterates that the President directed the suspension "in order to allow the Secretary of State to review application and adjudication processes." These explanations do not support a finding that the travel and admission of refugees would be detrimental to the interests of the United States.

### iii

Section 6(b) of EO2 restricts entry of refugees to no more than 50,000 in the 2017 fiscal year because entry in excess of 50,000 "would be detrimental to the interests of the United States." 82 Fed. Reg. at 13216. But in accordance with 8 U.S.C. § 1157, President Obama previously determined that the admission of 110,000 refugees to the United States during fiscal year 2017 was justified by humanitarian concerns or otherwise in the national interest. *See* Presidential Determination on Refugee Admissions for Fiscal Year 2017, Presidential Determination No. 2016-13, 81 Fed. Reg. 70315 (Sept. 28, 2016); *see also* Proposed Refugee Admissions for Fiscal Year 2017: Report to the Congress,

---

United Nations High Commissioner for Refugees, the National Counterterrorism Center, the Federal Bureau of Investigation, the Department of Homeland Security, the Department of Defense, the Department of State, and the U.S. intelligence community. *See* Brief of Former National Security Officials as Amici Curiae, Dkt. No. 108 at 14–16.

46

https://www.state.gov/documents/organization/262168.pdf.[18]

To the extent that 60,000 additional refugees can be considered a class of aliens, EO2 makes *no* findings to justify barring entry in excess of 50,000 as detrimental to the interests of the United States. EO2 gives no explanation for why the 50,001st to the 110,000th refugee would be harmful to the national interest, nor does it specify any further threat to national security. And there is not any rationale explaining why the previous target admission of 110,000 refugees this fiscal year was justified by humanitarian concerns or otherwise in the national interest, *see* 8 U.S.C. § 1157(a)(2), but that the entry of more than 50,000 refugees this same fiscal year would be detrimental to the national interest. Here too, the President did not meet the statutory precondition of exercising his authority under § 1182(f) to cap refugee admissions.

The actions taken in Sections 2 and 6 require the President first to make sufficient findings that the entry of nationals from the six designated countries and the entry of all refugees would be detrimental to the interests of the United States. We conclude that the President did not satisfy this precondition before exercising his delegated authority. Plaintiffs have shown a likelihood of success on the merits

---

[18] As of May 31, 2017, the United States has admitted 46,403 refugees in the 2017 fiscal year. U.S. Dep't of State, Bureau of Population, Refugees, and Migration, Refugee Admissions Report (2017), http://www.wrapsnet.org/admissions-and-arrivals (last visited June 6, 2017).

of their claim that the President exceeded his authority under §§ 1182(f) and 1185(a).

**2**

Plaintiffs contend that Section 2(c) of the Order violates the INA because it discriminates on the basis of nationality, thus violating the non-discrimination mandate of § 1152(a)(1)(A) of the INA. They argue that although the President is given broad authority under § 1182(f), this authority is restrained by § 1152(a)(1)(A).

Contemporaneous to enacting the Civil Rights Act of 1964 and the Voting Rights Act of 1965, Congress passed the INA of 1965 to eliminate the "national origins system as the basis for the selection of immigrants to the United States." H.R. Rep. No. 89-745, at 8 (1965). Section 1152(a)(1)(A) was enacted as part of that act, and provides:

> [N]o person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, *nationality*, place of birth, or place of residence.

8 U.S.C. § 1152(a)(1)(A) (emphasis added). Section 1152(a)(1)(A) contains specific exemptions, and § 1182(f) is not among them.

The Government tries to reconcile the Order's Section 2(c) with § 1152(a)(1)(A) by arguing that Section 2(c) bars *entry* of nationals from the six designated countries but does not deny the *issuance of immigrant visas* based on

48

nationality. EO2's suspension of entry on the basis of nationality, however, in substance operates as a ban on visa issuance on the basis of nationality. The Order's text confirms as much. Its primary purpose is to evaluate screening and vetting procedures associated with the visa issuance process. 82 Fed. Reg. at 13209. EO2 affects nationals of the six designated countries who were outside of the United States on the effective date of the Order but did not have a valid visa at specific times, such as the effective date of EO1. 82 Fed. Reg. at 13213. Further, it provides for a waiver so consular officers or Customs and Border Protection officials may authorize the issuance of visas during the suspension period. *Id.* at 13214. The Government also stresses that it should not be required to issue visas for aliens who are validly barred from entry, explaining that "[r]equiring that such aliens be issued visas permitting them to travel to this country, only to be denied entry upon arrival, would create needless difficulties and confusion." Indeed, the Government clarified at oral argument that as a practical matter, the entry ban would be implemented through visa denials. Moreover, the statute makes clear that aliens deemed inadmissible under § 1182, including under § 1182(f) "are ineligible to receive visas," thus confirming the substantial overlap between a denial of entry under § 1182(f) and a visa denial. *See* 8 U.S.C. § 1182(a); *see also Int'l Refugee Assistance Project*, 2017 WL 2273306, at *52 (Thacker, J., concurring) (explaining that the Government's "own arguments and the text and

49

operation of [EO2] belie [the] notion" that the visa issuance process is a different activity than suspension of entry).

We cannot blind ourselves to the fact that, for nationals of the six designated countries, EO2 is effectively a ban on the issuance of immigrant visas. If allowed to stand, EO2 would bar issuance of visas based on nationality in violation of § 1152(a)(1)(A). The Government did not dispute this point at oral argument, and it stands to reason that the whole system of the visa issuance would grind to a halt for nationals of the six designated countries whose entry is barred from the United States. Issuance of visas will automatically stop for those who are banned based on nationality. Yet Congress could not have used "more explicit language" in "unambiguously direct[ing] that no nationality-based discrimination shall occur." *Legal Assistance for Vietnamese Asylum Seekers*, 45 F.3d at 473.

The Government additionally argues that § 1152(a)(1)(A) does not displace the President's preexisting authority under § 1182(f), because the President may validly bar *entry* and the non-discrimination mandate applies strictly to the *issuance of visas*. Based on the plain statutory text, the Government contends that the non-discrimination mandate of § 1152(a)(1)(A) does not reach the President's suspension of entry under § 1182(f).

This argument, however, presents a clear conflict between § 1152(a)(1)(A) and § 1182, because it would enable the President to restore discrimination on the

50

basis of nationality that Congress sought to eliminate. It is our duty, if possible, to reconcile the President's statutory authority under § 1182(f) with the non-discrimination mandate of § 1152(a)(1)(A). We begin with the instruction that "all parts of a statute, if at all possible, are to be given effect." *Weinberger v. Hyson, Westcott & Dunning, Inc.*, 412 U.S. 609, 633 (1973); *accord Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("A court must . . . fit, if possible, all parts into an harmonious whole." (internal citation and quotation marks omitted)). We also look "to the design of the statute as a whole and to its object and policy." *Gozlon-Peretz v. United States*, 498 U.S. 395, 407 (1991) (quoting *Crandon v. United States,* 494 U.S. 152, 158 (1990)).

Under the Government's argument, the President could circumvent the limitations set by § 1152(a)(1)(A) by permitting the issuance of visas to nationals of the six designated countries, but then deny them entry. Congress could not have intended to permit the President to flout § 1152(a) so easily. *See Dada v. Mukasey*, 554 U.S. 1, 16 (2008) (courts should not read statutes in such a way that renders them a "nullity" or is "unsustainable").

To avoid this result, and to give effect to § 1152(a)(1)(A), the section "is best read to prohibit discrimination throughout the visa process, which must include the decision whether to admit a visa holder upon presenting the visa." Brief of Former Immigration and Homeland Security Officials as Amici Curiae,

51

Dkt. No. 176 at 9.  In prohibiting nationality-based discrimination in the issuance of immigrant visas, Congress also in effect prohibited nationality-based discrimination in the admission of aliens.  "Congress could not have intended to prohibit discrimination at the embassy, but permit it at the airport gate."  Brief of Technology Companies as Amici Curiae, Dkt. No. 180 at 20.  We do not suggest that visa holders must gain automatic entry into the United States, but rather, that visa holders cannot be discriminated against on the basis of "race, sex, nationality, place of birth, or place of residence" throughout the visa process, whether during the issuance of a visa or at the port of entry.[19]

Our conclusion that § 1152(a)(1)(A)'s non-discrimination mandate cabins the President's authority under § 1182(f) is reinforced by other canons of statutory construction.

First, a later enacted, more specific statute generally governs over an earlier, more general one.  *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 183–87 (2012).  Here, § 1152(a)(1)(A) was enacted in 1965, after § 1182(f) was enacted in 1952.  Section 1152(a)(1)(A) is also more

---

[19] While a foreign national may properly obtain a visa, this does not guarantee entry into the United States because they may otherwise be inadmissible.  *See* 8 U.S.C. § 1201(h) ("Nothing in this chapter shall be construed to entitle any alien, to whom a visa or other documentation has been issued, to be admitted to the United States."); *see also* 8 U.S.C. § 1182 (listing the myriad ways an alien can be deemed inadmissible).

specific, and sets a limitation on the President's broad authority to exclude aliens—he may do so, but not in a way that discriminates based on nationality. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2071 (2012) ("The general/specific canon is perhaps most frequently applied to statutes in which a general permission or prohibition is contradicted by a specific prohibition or permission. To eliminate the contradiction, the specific provision is construed as an exception to the general one.").

Second, § 1152(a)(1)(A) specifically identifies exemptions from the non-discrimination mandate, implying that unmentioned sections are not exempted. *See United Dominion Indus., Inc. v. United States*, 532 U.S. 822, 836 (2001) ("The logic that invests the omission with significance is familiar: the mention of some implies the exclusion of others not mentioned."). Section 1152(a)(1)(A) explicitly exempts three different INA provisions from its application—8 U.S.C. §§ 1101(a)(27), 1151(b)(2)(A)(i), and 1153—all of which deal with giving preference to certain immigrants, such as family members of current citizens and permanent residents. Had Congress likewise intended to permit § 1182(f) to override § 1152(a)(1)(A)'s non-discrimination requirement, it would have done so in the same way it did for the other provisions.

The Government contends that §§ 1182(f) and 1185(a)(1) "have long been understood to permit the president to draw nationality-based distinctions."

53

However, as discussed above, *supra* note 13, prior executive orders and proclamations did not suspend classes of aliens on the basis of national origin, but instead on the basis of affiliation or culpable conduct.  *See* Kate M. Manuel, *Executive Authority to Exclude Aliens: In Brief* 6–10, Congressional Research Service (2017).  The other instances cited by the Government are distinguishable.  The executive order at issue in *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993), made no nationality-based distinctions and concerned "suspend[ing] the entry of aliens coming by sea to the United States without necessary documentation."  Exec. Order No. 12807, 57 Fed. Reg. 23133 (May 24, 1992).  President Carter's executive orders in response to the Iranian hostage crisis delegated authority to the Secretary of State and the Attorney General to prescribe limitations governing the entry of Iranian nationals and did not ban Iranian immigrants outright.  *See* Exec. Order 12172, 44 Fed. Reg. 67947 (Nov. 26, 1979), *amended by* Exec. Order 12206, 45 Fed. Reg. 24101 (Apr. 7, 1980).  Finally, President Reagan's Proclamation 5517 suspended the entry of Cuban nationals coming as immigrants, with some exceptions.  51 Fed. Reg. 30470 (Aug. 22, 1986).  The proclamation did not exclude all foreign nationals, as exceptions were provided, and the proclamation was in response to Cuba's decision "'to suspend all types of procedures regarding the execution' of the December 14, 1984,

immigration agreement between the United States and Cuba."[20] *Id.* To be clear, Presidents have invoked §§ 1182(f) and 1185(a)(1) to restrict certain aliens or classes of aliens from entering the United States, but EO2 is unprecedented in its scope, purpose, and breadth.

The Government also argues that the President may engage in discrimination on the basis of nationality because of the exception provided in § 1152(a)(1)(B). Section 1152(a)(1)(B) provides, "[n]othing in [§ 1152(a)(1)(A)] shall be construed to limit the authority of the Secretary of State to determine the procedures for the processing of immigrant visa applications or the locations where such applications will be processed." However, this provision governs the Secretary of State's manner and place for processing applications, not the President's asserted ability to deny immigrant visas on the basis of nationality.

Having considered the President's authority under § 1182(f) and the non-discrimination mandate of § 1152(a)(1)(A), we also conclude that Plaintiffs have shown a likelihood of success on the merits of their claim that Section 2(c) of the Order, in suspending the issuance of immigrant visas and denying entry based on nationality, exceeds the restriction of § 1152(a)(1)(A) and the overall statutory

---

[20] Because these executive actions were not challenged as violations of § 1182(f) or § 1152(a)(1)(A), "the judiciary [has not] address[ed] whether the order[s] complied with those provisions or the Constitution." *Int'l Refugee Assistance Project*, 2017 WL 2273306, at *45 n.11 (Wynn, J., concurring).

scheme intended by Congress.

**3**

Aside from the President's failure to make the requisite findings to justify reducing the entry of refugees in fiscal year 2017 as an exercise of authority under § 1182(f), Plaintiffs contend that 8 U.S.C. § 1157 circumscribes the President's actions in setting the number of refugees to be admitted this fiscal year. We agree.

The Refugee Act of 1980 amended the INA "to provide a permanent and systematic procedure for the admission to this country of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted." Pub. L. No. 96-212, § 101, 94 Stat. 102 (1980).

The Act requires that the President, after consulting with Congress, set the annual admission of refugees before the beginning of every fiscal year:

> [T]he number of refugees who may be admitted under this section in any fiscal year . . . shall be such number as the President determines, before the beginning of the fiscal year and after appropriate consultation, is justified by humanitarian concerns or is otherwise in the national interest.

8 U.S.C. § 1157(a)(2). "Appropriate consultation" is defined as "discussions in person by designated Cabinet-level representatives of the President with members of the Committees on the Judiciary of the Senate and of the House of Representatives." *Id.* § 1157(e). After undergoing this process in 2016, President

Obama determined that the admission of 110,000 refugees to the United States during fiscal year 2017 was justified by humanitarian concerns or otherwise in the national interest. *See* 81 Fed. Reg. at 70315. Section 6(b) of EO2 reduced the refugee admission cap for the same year to 50,000. *See* 82 Fed. Reg. at 13216.

The statute requires the President to set the number of annual refugee admissions (1) before the start of the new fiscal year, and (2) after appropriate consultation with Congress. The Government responds that § 1157 only refers to a ceiling—not the floor—for the number of refugees who may be admitted, and that §§ 1182(f) and 1185(a)(1) permit the President to lower the number of refugees permitted to enter.

We disagree. This interpretation reads out the language that the number of refugees who may be admitted *shall be* the number determined by the President. *See* 8 U.S.C. § 1157(a)(2). The Government's argument would require us to conclude that Congress set forth very specific requirements for the President to provide the number and allocation of the refugees to be admitted as justified by humanitarian concerns or the national interest, after appropriate consultation, only to permit the President to order a midyear reduction in the level of refugee admissions, and to do so without consulting Congress. Section 1157 contemplates that the President, after consultation with Congress, may *increase* the number of refugees admitted in the middle of the fiscal year, but does not provide a

57

mechanism for the President to *decrease* the number of refugees to be admitted mid-year. *See id.* § 1157(b) (describing how, after appropriate consultation, the President may fix a number of additional refugees to be admitted to the United States).

Well-settled interpretive canons further explain why § 1182(f) does not give the President authority to override the requirements of § 1157. First, applying the "later in time" canon, § 1182(f) was adopted in 1952, and § 1157 was adopted in 1980, indicating that this subsequent statute shapes the scope of the President's authority. *See Brown & Williamson Tobacco Corp.*, 529 U.S. at 143 ("The 'classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute.'" (quoting *United States v. Fausto*, 484 U.S. 439, 453 (1988))).

Second, § 1157, the more specific provision, controls the more general § 1182(f). *See id.* ("This is particularly so where the scope of the earlier statute is broad but the subsequent statutes more specifically address the topic at hand."); *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976). Section 1157 provides a very specific process for "appropriate consultation" that the President must follow before setting the number of refugees to be admitted to the United States that is justified by humanitarian concerns or is otherwise in the national

interest. "Appropriate consultation" requires in-person discussions between cabinet-level representatives and members of Congress "to review the refugee situation or emergency refugee situation, to project the extent of possible participation of the United States therein, [and] to discuss the reasons for believing that the proposed admission of refugees is justified by humanitarian concerns or grave humanitarian concerns or is otherwise in the national interest . . . ." 8 U.S.C. § 1157(e). As part of the consultation, the Executive also must present the following information:

> (1) A description of the nature of the refugee situation.
> (2) A description of the number and allocation of the refugees to be admitted and an analysis of conditions within the countries from which they came.
> (3) A description of the proposed plans for their movement and resettlement and the estimated cost of their movement and resettlement.
> (4) An analysis of the anticipated social, economic, and demographic impact of their admission to the United States.
> (5) A description of the extent to which other countries will admit and assist in the resettlement of such refugees.
> (6) An analysis of the impact of the participation of the United States in the resettlement of such refugees on the foreign policy interests of the United States.
> (7) Such additional information as may be appropriate or requested by such members.

*Id.* According to the statute, this information would ideally be provided at least two weeks in advance of the discussions. *Id.*

Congress prescribed specific actions the President must take before setting the number of refugees who may be admitted as justified by humanitarian concerns

59

or as otherwise in the national interest. *See generally* 8 U.S.C. § 1157. The President relied on § 1182(f)—an earlier and more general provision—to conclude that admission of refugees above 50,000 is detrimental to the interest of the United States. But § 1157, a "narrow, precise, and specific" statutory provision, may not be overridden by § 1182(f), a provision "covering a more generalized spectrum" of issues. *Radzanower*, 426 U.S. at 153–54; *see also Nitro–Lift Techs., LLC v. Howard*, 133 S. Ct. 500, 504 (2012) (explaining that the interpretive principle *generalia specialibus non derogant* means that "the specific governs the general" and applies to conflict between "laws of equivalent dignity").

As a result, Plaintiffs have also shown a likelihood of success on the merits for their argument that Section 6(b) of EO2 conflicts with 8 U.S.C. § 1157.

**4**

Plaintiffs additionally argue that EO2 conflicts with 8 U.S.C. § 1182(a)(3)(B), which sets forth detailed and "specific criteria for determining terrorism-related inadmissibility." *Din*, 135 S. Ct. at 2140.

EO2 attempts to eliminate the marginal risk of "erroneously permitting entry of a national of one of these countries who intends to commit terrorist acts," 82 Fed. Reg. at 13211, by suspending entry of all nationals from the six designated countries. We need not decide the precise scope of § 1182(f) authority in relation to § 1182(a)(3)(B) because the President has not met the precondition to exercising

60

his power under § 1182(f), that is, of making a detrimentality finding. We note, however, that executive action should not render superfluous Congress's requirement that there be a "reasonable ground to believe" that an alien "is likely to engage after entry in any [specifically defined] terrorist activity," 8 U.S.C. § 1182(a)(3)(B)(i)(II), and other specific grounds for terrorism-related admissibility. *Cf. Abourezk*, 785 F.2d at 1049 n.2 ("The President's sweeping proclamation power [under § 1182(f)] provides a safeguard against the danger posed by any particular case or class of cases *that is not covered* by one of the categories in section 1182(a)." (emphasis added)); *Allende v. Shultz*, 845 F.2d 1111, 1118 (1st Cir. 1988) ("Each subsection [of § 1182(a)] creates a different and distinct ground for exclusion.").

**5**

Finally, we note that in considering the President's authority, we are cognizant of Justice Jackson's tripartite framework in *Youngstown Sheet & Tube Co. v. Sawyer*. *See* 343 U.S. 579, 635–38 (1952) (Jackson, J., concurring). Section 1182(f) ordinarily places the President's authority at its maximum. "When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Id.* at 635. However, given the express will of Congress through § 1152(a)(1)(A)'s non-discrimination mandate, § 1157's

61

procedure for refugee admissions to this country, and § 1182(a)(3)(B)'s criteria for determining terrorism-related inadmissibility, the President took measures that were incompatible with the expressed will of Congress, placing his power "at its lowest ebb." *Id.* at 637. In this zone, "Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system." *Id.* at 638. We have based our decision holding the entry ban unlawful on statutory considerations, and nothing said herein precludes Congress and the President from reaching a new understanding and confirming it by statute. If there were such consensus between Congress and the President, then we would view Presidential power at its maximum, and not in the weakened state based on conflict with statutory law. *See id.* at 635–38.

* * *

In sum, we conclude that Plaintiffs have shown a likelihood of success on the merits at least as to their arguments that EO2 contravenes the INA by exceeding the President's authority under § 1182(f), discriminating on the basis of nationality, and disregarding the procedures for setting annual admissions of refugees.[21]

---

[21] Because this claim relates to EO2's conflict with the INA, we leave open whether and in what circumstances the President may suspend entry under his

# C

The current record is sufficient to permit the court's evaluation of the irreparable harms threatening Plaintiffs. Plaintiffs identify harms, such as prolonged separation from family members, constraints to recruiting and attracting students and faculty members to the University of Hawai'i, decreased tuition revenue, and the State's inability to assist in refugee resettlement. Many of these harms are not compensable with monetary damages and therefore weigh in favor of finding irreparable harm. *See, e.g.*, *Washington*, 847 F.3d at 1169 (identifying harms such as harms to States' university employees and students, separated families, and stranded States' residents abroad); *Regents of Univ. of Cal. v. Am. Broad. Cos., Inc.*, 747 F.2d 511, 520 (9th Cir. 1984) (crediting intangible harms such as the "impairment of their ongoing recruitment programs [and] the dissipation of alumni and community goodwill and support garnered over the years"); *cf. Moore v. City of E. Cleveland, Ohio*, 431 U.S. 494, 503–04 (1977) (explaining that "the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition").

We conclude Plaintiffs are likely to suffer irreparable harm in the absence of

---

inherent powers as commander-in-chief or in a time of national emergency. *See, e.g.*, *Legal Assistance for Vietnamese Asylum Seekers*, 45 F.3d at 473.

preliminary relief.

## D

In considering the equities of a preliminary injunction, we next "balance the competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24.

The district court did not abuse its discretion in finding that the balance of hardships tipped in Plaintiffs' favor. The Government argues that the injunction causes direct, irreparable injury by constraining the Executive's authority in "protect[ing] national security on behalf of the entire United States."[22] "[T]he Government's interest in combating terrorism is an urgent objective of the highest order." *Humanitarian Law Project*, 561 U.S. at 28. Nonetheless, the President must exercise his authority under § 1182(f) lawfully by making sufficient findings justifying that entry of certain classes of aliens would be detrimental to the national interest and ensuring that such exercise does not conflict with other INA

---

[22] To the extent the Government argues that it is injured simply by nature of the judiciary limiting the President's authority, *ipso facto*, when it argues that it suffered a "form of irreparable injury" because it was "enjoined by a court from effectuating statutes enacted by representatives of its people," we reject that argument. *See Robel*, 389 U.S. at 264 ("[The] concept of 'national defense' cannot be deemed an end in itself, justifying any exercise of . . . power designed to promote such a goal. Implicit in the term 'national defense' is the notion of defending those values and ideals which set this Nation apart."); *see also Int'l Refugee Assistance Project*, 2017 WL 2273306, at *25 (rejecting the Government's "institutional injury" argument, as "even the President's actions are not above judicial scrutiny").

provisions. Because the President has not done so, we cannot conclude that national security interests outweigh the harms to Plaintiffs. *See Int'l Refugee Assistance Project*, 2017 WL 2273306, at \*32 (Keenan, J., concurring in part and concurring in the judgment).

Further, the Government has not put forth evidence of injuries resulting from the preliminary injunction, or how the screening and vetting procedures in place before the Order was enjoined were inadequate such that the Order should take immediate effect. Continuing to enjoin portions of EO2 restores immigration procedures and programs to the position they were in prior to its issuance. *See Washington*, 847 F.3d at 1168; *see also* Brief of Former National Security Officials as Amici Curiae, Dkt. No. 108 at 9 (explaining that a number of amici officials, in office on January 20, 2017 and current on active intelligence, knew of no "credible terrorist threat streams directed against the United States" at that time).

In weighing the harms, the equities tip in Plaintiffs' favor.

**E**

Plaintiffs must finally show that preliminary injunctive relief is in the public interest.

National security is undoubtedly a paramount public interest. *See Haig v. Agee*, 453 U.S. 280, 307 (1981) ("[N]o governmental interest is more compelling

than the security of the Nation.").[23]  Although we recognize that "sensitive and weighty interests of national security and foreign affairs" are implicated, *Humanitarian Law Project*, 561 U.S. at 33–34, the President must nonetheless exercise his executive power under § 1182(f) lawfully.  The public interest is served by "curtailing unlawful executive action."  *Texas*, 809 F.3d at 187.

The public interests in uniting families and supporting humanitarian efforts in refugee resettlement support the conclusion that the public interest is served by preliminarily enjoining EO2 and maintaining the status quo.  *Cf. Solis-Espinoza v. Gonzales*, 401 F.3d 1090, 1094 (9th Cir. 2005) ("Public policy supports

---

[23] Several amici contend that the Order not only serves no national security interest, but actually harms our security.  *See, e.g.*, Brief of Former National Security Officials as Amici Curiae, Dkt. No. 108 at 2 (explaining that the Order will harm the country's national security and foreign policy interest: "It will endanger troops in the field, and disrupt key counterterrorism and national security partnerships.  It will aid the propaganda effort of the Islamic State in Iraq and the Levant ("ISIL") and support its recruitment message.  By feeding the narrative that the United States is at war with Islam, the Order will impair relationships with the very Muslim communities that law enforcement professionals rely on to address the threat of terrorism.  And it will have a damaging humanitarian and economic impact."); Brief of Former Federal Immigration and Homeland Security Officials as Amici Curiae, Dkt. No. 176 at 20–21 ("[T]he Order weakens vetting protocols and procedures by using national-origin discrimination as a substitute for individualized threat  assessments.  The Order also threatens to fracture critical military, intelligence, and counterterrorism partnerships and hinder cooperation with the very communities with which law enforcement professionals work to disrupt terrorist plots."); Brief of *Doe* Plaintiffs as Amici Curiae, Dkt. No. 276, Ex. G., U.S. Dep't of State, Dissent Channel: Alternatives to Closing Doors in Order to Secure Our Borders (voicing the State Department officers' concerns about EO1).  A draft DHS report also concluded that citizenship "is unlikely to be a reliable indicator of potential terrorist activity."

recognition and maintenance of a family unit.  The [INA] was intended to keep families together.  It should be construed in favor of family units and the acceptance of responsibility by family members."); *Kaliski v. Dist. Dir. of INS*, 620 F.2d 214, 217 (9th Cir. 1980) (explaining that "the humane purpose" of the INA is to reunite families).

Amici also have identified specific harms that will result if EO2 takes effect, bolstering the conclusion that the injunction is in the public interest.  They explain that EO2 would, *inter alia*: curtail children's ability to travel to the United States to obtain life-saving medical care, *see* Brief of the Foundation for the Children of Iran and Iranian Alliances Across Borders as Amici Curiae, Dkt. No. 77; undermine the efforts of religious organizations in the United States rendering humanitarian aid, *see* Brief of Episcopal Bishops as Amici Curiae, Dkt. No. 87; compromise the diversity interests that are central to universities, *see* Brief of New York University as Amicus Curiae, Dkt. No. 95; deter international students, faculty, and scholars from studying at American universities and harm the research mission of universities, *see* Brief of Colleges and Universities as Amici Curiae, Dkt. No. 97; impose additional hardship for child refugees already facing violence and trauma, *see* Brief of Professional Society on the Abuse of Children as Amicus Curiae, Dkt. No. 107; immediately harm refugees who will be denied entry and risk the vitality of entire refugee assistance programs and resettlement efforts, *see* Brief of

Interfaith Group of Religions and Interreligious Organizations as Amici Curiae, Dkt. No. 121, Brief of Oxfam America as Amicus Curiae, Dkt. No. 149, Brief of HIAS, IRC, and USCRI as Amici Curiae, Dkt. No. 155, Brief of *Doe* Plaintiffs as Amici Curiae, Dkt. No. 276; uniquely exclude Muslim family members, scholars, religious leaders, and professionals from entry, *see* Brief of Muslim Rights, Professional, and Public Health Organizations as Amici Curiae, Dkt. No. 124, Brief of Muslim Justice League et al. as Amici Curiae, Dkt. No. 207; inflict proprietary harms on the states by harming state colleges, disrupting staffing and research at state medical institutions, and reducing tax revenues and reinvestment of refugee funding into local economies, *see* Brief of Illinois et al. as Amici Curiae, Dkt. No. 125; undermine trust between law enforcement and immigrant communities and inflict financial and social costs, such as loss of tourism dollars, *see* Brief of Chicago et al. as Amici Curiae, Dkt. No. 137; interfere with union members' ability to do their work and serve the American public, *see* Brief of Service Employees International Union et al. as Amici Curiae, Dkt. No. 166; harm American competitiveness by disrupting ongoing business operations and inhibiting technology companies' abilities to attract talent, business, and investment to the United States, *see* Brief of Technology Companies as Amici Curiae, Dkt. No. 180, Brief of Massachusetts Technology Leadership Council as Amicus Curiae, Dkt. No. 194; place victims of gender-based violence at particular

68

risk, *see* Tahirih Justice Center et al. as Amici Curiae, Dkt. No. 185; interrupt foreign artists' exhibitions and performances in the United States, *see* Brief of the Association of Art Museum Directors et al. as Amici Curiae, Dkt. No. 204; and prevent U.S. citizens and lawful permanent residents from receiving visits from or reuniting with family members, *see* Brief of Human Rights First et al. as Amici Curiae, Dkt. No. 222.

The public interest favors affirming the preliminary injunction. *See Winter*, 555 U.S. at 24 ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.").

\* \* \*

Plaintiffs have satisfied all four factors to warrant entry of the preliminary injunction. *See id.* at 20. The district court did not abuse its discretion in granting an injunction.

## V

With respect to the injunction's scope, the Government contends that the district court erred by enjoining internal government procedures, giving nationwide relief, and entering an order against the President.

We review the scope of a preliminary injunction for abuse of discretion. *McCormack v. Hiedeman*, 694 F.3d 1004, 1010 (9th Cir. 2012). Although the

district court has "considerable discretion in fashioning suitable relief and defining the terms of an injunction," *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991), there are limitations on this discretion. Injunctive relief must be tailored to remedy the specific harms shown by the plaintiffs. *See id.* ("Injunctive relief . . . must be tailored to remedy the specific harm alleged."); *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[T]he scope of injunctive relief is dictated by the extent of the violation established . . . ."). "An overbroad injunction is an abuse of discretion." *Stormans*, 586 F.3d at 1140.

## A

The Government first argues that the injunction improperly enjoins enforcement of parts of Sections 2 and 6 that are unrelated to any alleged harm to Plaintiffs—specifically, the provisions that pertain to internal government operations and procedures.

Portions of Section 2 require various agencies to conduct a review of worldwide vetting procedures to determine what additional information, if any, is needed from each foreign country to adjudicate a visa application, prepare a report on the results of the worldwide review, submit a list of countries that do not provide requested information to the President, and recommend other lawful restrictions or limitations deemed necessary for the security of the United States. 82 Fed. Reg. at 13212–13. Likewise, during the interim period when refugee

70

admissions is suspended, Section 6 directs the Secretary of State, in conjunction with the Secretary of Homeland Security and the Director of National Intelligence, to conduct an internal review and implement additional procedures identified by the review. *Id.* at 13215. Section 6 also requires the Secretary of State to review the "existing law" to determine how State and local jurisdictions could have greater involvement in the process of determining refugee placement. *Id.* at 13216.

Although other unenjoined sections of EO2 permit interagency coordination to review vetting procedures, the district court nonetheless abused its discretion in enjoining the inward-facing tasks of Sections 2 and 6. Enjoining the entirety of Sections 2 and 6 was not narrowly tailored to addressing only the harms alleged. For example, internal determinations regarding the necessary information for visa application adjudications do not have an obvious relationship to the constitutional rights at stake or statutory conflicts at issue here. Plaintiffs have not shown how the Government's internal review of its vetting procedures will harm them. We vacate the preliminary injunction to the extent it enjoins internal review procedures that do not burden individuals outside of the executive branch of the federal government. *See Bresgal v. Brock*, 843 F.2d 1163, 1171 (9th Cir. 1987) ("An injunction against a government agency must be structured to take into account 'the well-established rule that the government has traditionally been granted the widest latitude in the "dispatch of its own internal affairs."'" (quoting *Rizzo v.*

*Goode*, 423 U.S. 362, 378–79 (1976))); *cf. Bowen v. Roy*, 476 U.S. 693, 700 (1986) (explaining that the Free Exercise Clause "affords an individual protection from certain forms of governmental compulsion [but] does not afford an individual a right to dictate the conduct of the Government's internal procedures").

**B**

The Government next argues that the district court erred in enjoining Section 6's refugee provisions, specifically the suspension of refugees and adoption of the 50,000 refugee cap.

The State alleges that Section 6 will force it to abandon the refugee program that embodies the State's traditions of openness and diversity. The State has several policies that aid and resettle refugees, and has a "long history of welcoming refugees impacted by war and oppression." As discussed earlier, OCS, a division of the Department of Labor and Industrial Relations, is directed to "[a]ssist and coordinate the efforts of all public and private agencies providing services which affect the disadvantaged, refugees, and immigrants." Haw. Rev. Stat. § 371K-4(5). OCS also operates the Refugee Social Services Program and the Refugee Cash and Medical Assistance Program. *See* Department of Labor and Industrial Relations, Office of Community Services, 2017 Hawaii State Plan for Refugee Assistance and Services (2016); https://labor.hawaii.gov/ocs/files/2013/02/FY17-State-Plan-for-Hawaii.pdf (last visited June 6, 2017). The State further highlights that aiding

72

refugees is central to the mission of private organizations, like Catholic Charities Hawai'i and Pacific Gateway Center.

Since fiscal year 2010, at least twenty refugees have arrived and resettled in Hawai'i, and in fiscal year 2017 to date, three have resettled there. While this is a small number of refugees, it does not diminish Hawai'i's interest in effectuating its refugee programs and investments. Enjoining the suspension and cap would protect the State's programs and efforts in resettling refugees.

Although the Government is correct in pointing out that most of Plaintiffs' alleged injuries center on the implementation of Section 2(c), at this preliminary stage of litigation, the district court did not abuse its discretion by enjoining Section 6's operative provisions suspending refugee admission on the basis of the current record. We therefore reject the Government's challenge on this point.

## C

The Government next contends that the district court erred by enjoining Section 2(c) as to all persons everywhere, rather than redressing only Plaintiffs' injuries. The Government requests that the nationwide injunction be limited to Plaintiffs only.[24]

---

[24] The Government also argues that to the extent § 1152(a)(1)(A) cabins executive authority, the injunction entered by the district court can only apply to immigrant visas and should not apply to *nonimmigrant* visas. We decline to narrow the injunction on the grounds proposed by the Government because, even assuming

The district court identified two reasons to support a nationwide injunction. First, the district court emphasized that in certain circumstances, it is appropriate for courts to issue nationwide injunctions. *Hawaiʻi PI*, 2017 WL 1167383, at *8. As the Fifth Circuit observed in *Texas v. United States*, nationwide injunctions are particularly appropriate in the immigration context because "immigration laws of the United States should be enforced vigorously and *uniformly*." 809 F.3d at 187–88; *see* U.S. Const. art. I, § 8, cl. 4 ("The Congress shall have Power . . . [t]o establish an *uniform* Rule of Naturalization . . . .") (emphasis added). Enjoining the conduct as to Plaintiffs may result in "fragmented immigration policy [that] would run afoul of the constitutional and statutory requirement for uniform immigration law and policy." *Washington*, 847 F.3d at 1166–67 (citing to *Texas*, 809 F.3d at 187–88)).

Second, the district court made clear that the Government did not provide a workable framework for narrowing the geographic scope of the injunction. *See id.* at 1167 ("[E]ven if limiting the geographic scope of the injunction would be desirable, the Government has not proposed a workable alternative form of the TRO that accounts for the nation's multiple ports of entry and interconnected transit system and that would protect the proprietary interests of the States at issue

the Government is correct, the President failed to meet the precondition to exercising his authority under § 1182(f).

74

here while nevertheless applying only within the States' borders."). On appeal, the Government has not offered any new workable method of limiting the geographic scope of the injunction.

An "injunction is not necessarily made over-broad by extending benefit or protection to persons other than prevailing parties in the lawsuit—even if it is not a class action—*if such breadth is necessary to give prevailing parties the relief to which they are entitled.*" *Bresgal*, 843 F.2d at 1170–71. Narrowing the injunction to apply only to Plaintiffs would not cure the statutory violations identified, which in all applications would violate provisions of the INA. *See Int'l Refugee Assistance Project*, 2017 WL 2273306, at *27 (affirming the nationwide injunction because Section 2(c) of EO2 likely violates the Establishment Clause, and its constitutional deficiency "would endure" in all applications); *cf. Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) ("[W]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989))).

The district court did not abuse its discretion in entering a nationwide preliminary injunction.

**D**

Finally, the Government argues that the district court erred by issuing an injunction that runs against the President himself. This position of the Government is well taken. Generally, we lack "jurisdiction of a bill to enjoin the President in the performance of his official duties." *Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) (quoting *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866)); *see id.* at 802 ("[I]njunctive relief against the President himself is extraordinary, and should . . . raise[] judicial eyebrows."). Injunctive relief, however, may run against executive officials, including the Secretary of Homeland Security and the Secretary of State. *See, e.g.*, *Youngstown Sheet & Tube Co.*, 343 U.S. at 588–89 (holding that President Truman did not act within his constitutional power in seizing steel mills and affirming the district court's decision enjoining the Secretary of Commerce from carrying out the order); *Franklin*, 505 U.S. at 802–03.

We conclude that Plaintiffs' injuries can be redressed fully by injunctive relief against the remaining Defendants, and that the extraordinary remedy of enjoining the President is not appropriate here. *See Franklin*, 505 U.S. at 803. We therefore vacate the district court's injunction to the extent the order runs against the President, but affirm to the extent that it runs against the remaining "Defendants and all their respective officers, agents, servants, employees, and attorneys, and persons in active concert or participation with them."

76

## E

The district court did err in enjoining the entirety of Sections 2 and 6, particularly the portions that pertain to interagency review, despite the Government's requests for clarification and requests to narrow the injunction to enjoin conduct that actually harms Plaintiffs. The district court abused its discretion in enjoining inward-facing agency conduct because enjoining this conduct would not remedy the harms asserted by Plaintiffs. Further, the district court abused its discretion in enjoining the President. We would not be able to affirm in full the preliminary injunction even if Plaintiffs were also likely to succeed on their constitutional claims, for reasons that enjoining internal review procedures does not remedy harms to Plaintiffs and because it is improper to enjoin the President without necessity. As we have affirmed the injunction in part on statutory grounds, and vacated certain parts on the basis of considerations governing the proper scope of an injunction, we need not consider the constitutional claims here.

## VI

We affirm in part and vacate in part the district court's preliminary injunction order. As to the remaining Defendants, we affirm the injunction as to Section 2(c), suspending entry of nationals from the six designated countries for 90 days; Section 6(a), suspending USRAP for 120 days; and Section 6(b), capping the

77

entry of refugees to 50,000 in the fiscal year 2017. We vacate the portions of the injunction that prevent the Government from conducting internal reviews, as otherwise directed in Sections 2 and 6, and the injunction to the extent that it runs against the President. We remand the case to the district court with instructions to re-issue a preliminary injunction consistent with this opinion.[25]

**AFFIRMED in part; VACATED in part; and REMANDED with instructions.** Each party shall bear its own costs on appeal.

---

[25] The Government's motion for a stay pending appeal is **DENIED** as moot.

# COUNSEL

Jeffrey Bryan Wall (argued), Acting Solicitor General; Edwin S. Kneedler, Deputy Solicitor General; Sharon Swingle, Anne Murphy, Lowell V. Sturgill Jr., H. Thomas Byron III, and Douglas N. Letter, Attorneys, Appellate Staff; August E. Flentje, Special Counsel to the Assistant Attorney General; Elliot Enoki, Acting United States Attorney; Chad A. Readler, Acting Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

Neal Kumar Katyal (argued), Colleen Roh Sinzdak, Mitchell P. Reich, and Elizabeth Hagerty, Hogan Lovells US LLP, Washington, D.C.; Thomas P. Schmidt, Hogan Lovells US LLP, New York, New York; Sara Solow and Alexander B. Bowerman, Hogan Lovells US LLP, Philadelphia, PA; Douglas S. Chin, Attorney General; Clyde J. Wadsworth, Solicitor General; Deirdre Marie-Iha, Donna H. Kalama, Kimberly T. Guidry, and Robert T. Nakatsuji, Deputy Attorneys General; Department of the Attorney General, Honolulu, Hawaiʻi; for Plaintiffs-Appellees.

Scott A. Keller, Solicitor General; J. Campbell Barker, Deputy Solicitor General; Ari Cuenin, Assistant Solicitor General; Ken Paxton, Attorney General; Jeffrey C. Mateer, First Assistant Attorney General; Office of the Attorney General, Austin, Texas; for Amici Curiae States of Texas, Alabama, Arizona, Arkansas, Florida, Kansas, Louisiana, Montana, North Dakota, Oklahoma, South Carolina, South Dakota, Tennessee, and West Virginia, and Governor Phil Bryant of the State of Mississippi.

Amir H. Ali, Roderick & Solange MacArthur Justice Center, Washington, D.C.; Jessica M. Wan, Lisa W. Cataldo, and David J. Minkin, McCorriston Miller Mukai MacKinnon LLP, Honolulu, Hawaiʻi; for Amicus Curiae The Roderick and Solange MacArthur Justice Center.

Robert D. Fram and Alexandra P. Grayner, Covington & Burling LLP, San Francisco, California; Andrew Guy, Michael Baker, Karun Tilak, and Ligia M. Markman, Covington & Burling LLP, Washington, D.C.; for Amici Curiae Interfaith Coalition.

Kevin P. Martin, Eileen L. Morrison, Alicia Rubio, Joshua M. Daniels, William B. Brady, and Nicholas K. Mitrokostas, Goodwin Procter LLP, Boston, Massachusetts, for Amici Curiae The Foundation for the Children of Iran and

Iranian Alliances Across Borders.

Michael R. Scott, Lisa J. Chaiet Rahman, and Amit D. Ranade, Hillis Clark Martin & Peterson P.S., Seattle, Washington, for Amici Curiae Episcopal Bishops.

Dan Jackson, R. Adam Lauridsen, and John W. Keker, Keker, Van Nest & Peters LLP, San Francisco, California, for Amicus Curiae Khizr Khan.

Lary A. Rappaport, Proskauer Rose LLP, Los Angeles, California; Terrance Nolan, General Counsel and Secretary, New York University, New York, New York; Claire Wong Black and J. Blaine Rogers, Alston Hunt Floyd & Ing, Honolulu, Hawai'i; Tiffany M. Woo, Seth D. Fiur, and Steven E. Obus, Proskaur Rose LLP, New York, New York; for Amicus Curiae New York University.

Aaron X. Fellmeth, Sandra Day O'Connor College of Law, Arizona State University, Phoenix, Arizona; Jonathan Hafetz, Seton Hall University School of Law, Newark, New Jersey; Joseph M. McMillan and Michelle L. Maley, Perkins Coie LLP, Seattle, Washington; for Amici Curiae International Law Scholars and Nongovernmental Organizations.

Lindsay C. Harrison, Tassity S. Johnson, Erica L. Ross, and Thomas J. Perrelli, Jenner & Block LLP, Washington, D.C., for Amici Curiae Colleges and Universities.

Mary Kelly Persyn, Persyn Law & Policy, San Francisco, California, for Amicus Curiae American Professional Society on the Abuse of Children.

Jonathan M. Freiman and Tahlia Townsend, Wiggin and Dana LLP, New Haven, Connecticut; Harold Hongju Koh and Hope Metcalf, Rule of Law Clinic, Yale Law School, New Haven, Connecticut; for Amici Curiae Former National Security Officials.

Anna-Rose Mathieson and Ben Feuer, California Appellate Law Group LLP, San Francisco, California, for Amici Curiae Scholars of American Religious History & Law.

Richard D. Bernstein, Willkie Farr & Gallagher LLP, Washington, D.C., for Amicus Curiae T.A., a U.S. Citizen of Yemeni Descent.

Joshua Matz, Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP,

Washington, D.C., for Amici Curiae Constitutional Law Scholars.

Marc A. Hearron, Morrison & Foerster LLP, Washington, D.C.; Purvi G. Patel, Morrison & Foerster LLP, Los Angeles, California; Amanda Aikman and Jennifer K. Brown, Morrison & Foerster LLP, New York, New York; Sandeep N. Nandivada, Morrison & Foerster LLP, McLean, Virginia; for Amici Curiae Interfaith Group of Religious and Interreligious Organizations.

Anton A. Ware, Arnold & Porter Kaye Scholer LLP, San Francisco, California; Aziz Huq, Johnathan J. Smith, and Farhana Khera, Muslim Advocates, Oakland, California; for Amici Curiae Muslim Rights, Professional and Public Health Organizations.

David L. Franklin, Solicitor General, and Lisa Madigan, Attorney General, Office of the Illinois Attorney General, Chicago, Illinois; for Amici Curiae States of Illinois, California, Connecticut, Delaware, Iowa, Maine, Maryland, Massachusetts, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, Virginia, and Washington, and the District of Columbia.

William S. Consovoy, Consovoy McCarthy Park PLLC, Arlington, Virginia; Kimberly S. Hermann, Southeastern Legal Foundation, Marietta, Georgia; for Amicus Curiae Southeastern Legal Foundation, Inc.

Edward L. White III and Erik M. Zimmerman, American Center for Law and Justice, Ann Arbor, Michigan; Geoffrey R. Surtees and Francis J. Manion, American Center for Law and Justice, New Hope, Kentucky; Benjamin P. Sisney, Matthew R. Clark, Craig L. Parshall, Jordan Sekulow, Andrew J. Ekonomou, Colby M. May, Stuart J. Roth, and Jay Alan Sekulow, American Center for Law and Justice, Washington, D.C.; for Amicus Curiae American Center for Law and Justice.

Pratik A. Shah and Martine E. Cicconi, Akin Gump Strauss Hauer & Feld LLP, Washington, D.C.; Robert S. Chang, Fred T. Korematsu Center for Law and Equality, Seattle, Washington; Eric Yamamoto, Fred T. Korematsu Professor of Law and Social Justice, Honolulu, Hawai'i; Claire Wong Black and Louise K.Y. Ing; Alston Hunt Floyd & Ing, Honolulu, Hawai'i; Alice Hsu and Robert A. Johnson, Akin Gump Strauss Hauer & Feld LLP, New York, New York; Jessica M. Weisel, Akin Gump Strauss Hauer & Feld LLP, Los Angeles, California; for Amici Curiae Fred T. Korematsu Center for Law and Equality, Jay Hirabayashi, Holly Yasui, Karen Korematsu, Civil Rights Organizations, and National Bar

Associations of Color.

Richard B. Katskee, Carmen Green, Bradley Girard, Kelly M. Percival, Andrew L. Nellis, and Eric Rothschild, Americans United for Separation of Church and State, Washington, D.C.; Gillian Gillers and Kristi L. Graunke, Southern Poverty Law Center, Atlanta, Georgia; for Amici Curiae Members of the Clergy, Americans United for Separation of Church and State, Bend the Arc: A Jewish Partnership for Justice, The Riverside Church in the City of New York, and The Southern Poverty Law Center.

Benna Ruth Solomon, Deputy Corporation Counsel; Edward N. Siskel, Corporation Counsel; City of Chicago Department of Law, Chicago, Illinois; Eliberty Lopez, Brian Neff, and Ryan P. Poscablo, Riley Safer Holmes & Cancila LLP, New York, New York; Nick Kahlon, Riley Safer Holmes & Cancila LLP, Chicago, Illinois; for Amici Curiae Cities of Chicago, Los Angeles, New York, Philadelphia, and Other Major Cities and Counties.

Linda A. Klein, President, American Bar Association, Chicago, Illinois; Jared S. Stein, Arianna Markel, Erin J. Morgan, Aidan Synnott, and Sidney S. Rosdeitcher, New York, New York; for Amicus Curiae American Bar Association.

Jonathan A. Scruggs and Kevin H. Theriot, Alliance Defending Freedom, Scottsdale, Arizona, as and for Amicus Curiae Alliance Defending Freedom.

Richard P. Bress, Alexandra P. Schechtel, and Elana Nightingale Dawson, Latham & Watkins LLP, Washington, D.C.; Christopher Mortweet, Latham & Watkins LLP, Menlo Park, California; for Amicus Curiae Oxfam America, Inc.

Christopher J. Hajec, Mark S. Venezia, and Elizabeth A. Hohenstein, Immigration Reform Law Institute, Washington, D.C., as and for Amicus Curiae Immigration Reform Law Institute.

G. Eric Brunstad, Jr., Dechert LLP, Hartford, Connecticut, for Amici Curiae HIAS, The IRC, and USCRI.

Steve W. Berman, Hagens Berman Sobol Shapiro LLP, Seattle, Washington; Leo Gertner, Deborah L. Smith, Claire Prestel, and Nicole G. Berner, Service Employees International Union, for Amicus Curiae Service Employees International Union; Judith Rivlin, Washington, D.C., as and for Amicus Curiae American Federation of State, County, and Municipal Employees; Channing M.

Cooper and David J. Strom, Washington, D.C., as and for Amicus Curiae American Federation of Teachers.

Peter Jaffe, Brent Wible, Lauren Kaplin, and Daniel Braun, Freshfields Bruckhaus Deringer US LLP, Washington, D.C.; Karen Wiswall and David Y. Livshiz, Freshfields Bruckhaus Deringer US LLP, New York, New York; for Amicus Curiae Cato Institute.

Kenneth A. Klukowski, Alexandria, Virginia, as and for Amicus Curiae American Civil Rights Union.

Elizabeth B. Wydra, David H. Gans, and Brianne J. Gorod, Constitutional Accountability Center, Washington, D.C.; Peter Karanjia and Jason Harrow, Davis Wright Tremaine LLP, Washington, D.C.; Raymond H. Brescia, Associate Professor of Law, Albany Law School, Albany, New York; Victor A. Kovner, Davis Wright Tremaine LLP, New York, New York; for Amici Curiae 165 Members of Congress.

Michael J. Gottlieb, Aaron E. Nathan, Cain Norris, J. Wells Harrell, Isra Bhatty, and Joshua Riley, Boies Schiller Flexner LLP, Washington, D.C.; Eli Glasser, Boies Schiller Flexner LLP, Fort Lauderdale, Florida; for Amici Curiae Former Federal Immigration and Homeland Security Officials.

Andrew J. Pincus and Paul W. Hughes, Mayer Brown LLP, Washington, D.C., for Amici Curiae Technology Companies.

Nathaniel C. Love and Robert N. Hochman, Sidley Austin LLP, Chicago, Illinois; Charles Roth, National Immigrant Justice Center, Chicago, Illinois; for Amicus Curiae National Immigrant Justice Center; Gail Pendelton, Suffield, Connecticut, as and for Amicus Curiae ASISTA; Jennie Santos-Bourne, Miami, Florida, as and for Amicus Curiae Americans for Immigrant Justice; Linda A. Seabrook, General Counsel, San Francisco, California, as and for Amicus Curiae Futures Without Violence; Jean Bruggeman, Arlington, Virginia, as and for Amicus Curiae Freedom Network USA; Amily K. McCool, Durham, North Carolina, as and for Amicus Curiae North Carolina Coalition Against Domestic Violence.

Victor Williams, Bethesda, Maryland, pro se for Amicus Curiae America First Lawyers Association.

Scott L. Winkelman, Justin Kingsolver, Avi Rutschman, and Luke van

Houwelingen, Crowell & Moring LLP, Washington, D.C., for Amici Curiae Tahirih Justice Center, The Asian Pacific Institute on Gender-Based Violence, Casa de Esperanza, and National Domestic Violence Hotline.

James W. Kim, McDermott Will & Emery LLP, Washington, D.C.; Albert Giang, Rachana Pathak, Meredith S.H. Higashi, Navdeep Singh, and Tina R. Matsuoka, National Asian Pacific American Bar Association, Washington, D.C.; for Amicus Curiae National Asian Pacific American Bar Association.

Brett R. Tobin, Goodsill Anderson Quinn & Stifel LLP, Honolulu, Hawai'i; Daniel L. McFadden, Christopher E. Hart, Kristyn DeFilipp, and Michael B. Keating, Foley Hoag LLP, Boston, Massachusetts, for Amicus Curiae Massachusetts Technology Leadership Council, Inc.

Avi Gesser, Ilan Stein, Jennifer Prevete, Alex Messiter, Joseph Garmon, and Kelsey Clark, Davis Polk & Wardwell LLP, New York, New York, for Amici Curiae Association of Art Museum Directors, American Alliance of Museums, Association of Academic Museums and Galleries, College Art Association, and 101 Art Museums.

Herbert W. Titus, Jeremiah L. Morgan, William J. Olson, and Robert J. Olson, William J. Olson P.C., Vienna, Virginia; Michael Boos, Citizens United, Washington, D.C.; Joseph W. Miller, U.S. Justice Foundation, Ramona, California; for Amici Curiae U.S. Justice Foundation, Citizens United, Citizens United Foundation, English First Foundation, English First, Public Advocate of the United States, Gun Owners Foundation, Gun Owners of America, Conservative Legal Defense and Education Fund, U.S. Border Control Foundation, and Policy Analysis Center.

Benjamin G. Shatz, Ketakee Kane, Olufunmilayo Showole, Matthew Bottomly, Sirena Castillo, John W. McGuinness, and Amy Briggs, Manatt Phelps & Phillips LLP, Los Angeles, California, for Amici Curiae Muslim Justice League, Islamic Circle of North America, and Council of American-Islamic Relations, California.

Claire Loebs Davis, Taylor Washburn, and Jessica N. Walder, Lane Powell PC, Seattle, Washington, for Amici Curiae Law Professors.

Lena F. Masri, National Litigation Director, Council on American-Islamic Relations, Washington, D.C.; Gadeir I. Abbas, Law Office of Gadeir Abbas, Washington, D.C.; for Amici Curiae Muslim Civil Rights Activists Linda Sarsour,

Rashida Tlaib, Zahra Billoo, Basim Elkarra, Hussam Ayloush, Alia Salem, Adam Soltani, Imraan Siddiqi, Namira Islam, Karen Dabdoub, Jim Sues, Hanif Mohebi, and Jaylani Hussein.

Ester Sung, Melissa S. Keaney, Nicholas Espíritu, and Karen C. Tumlin, National Immigration Law Center, Los Angeles, California; Justin B. Cox, National Immigration Law Center, Atlanta, Georgia; Mark Doss, Lara Finkbeiner, Stephen Poellot, and Rebecca Heller, International Refugee Assistance Project at the Urban Justice Center, New York, New York; for Amici Curiae National Immigration Law Center and International Refugee Assistance Project.

Nicole Y. Altman, Goodsill Anderson Quinn & Stifel LLP, Honolulu, Hawai'i; Lilly Landsman-Roos and John B. Harris, Frankfurt Kurnit Klein & Selz PC, New York, New York; Michael Lieberman, Melissa Garlick, Lauren A. Jones, and Steven M. Freeman, Anti-Defamation League, New York, New York; Doron F. Ezickson, Anti-Defamation League, Washington, D.C.; Alyssa T. Saunders and David E. Mills, Cooley LLP, Washington, D.C.; David Bohm, Danna McKintrick P.C., St. Louis, Missouri; for Amici Curiae Anti-Defamation League, Jewish Council for Public Affairs, Union for Reform Judaism, Central Conference of American Rabbis, and Women of Reform Judaism.

Alan C. Turner, Simpson Thacher & Bartlett LLP, New York, New York; Jonathan Mincer and Harrison Frahn, Simpson Thacher & Bartlett LLP, Palo Alto, California; for Amici Curiae Human Rights First, Kids in Need of Defense (KIND), City Bar Justice Center, Community Legal Services in East Palo Alto, Catholic Migration Services, the Door's Legal Services Center, Safe Passage Project, and Sanctuary for Families.

Matthew E. Sloan, Alyssa J. Clover, Richard A. Schwartz, and Allison B. Holcombe, Skadden, Arps, Slate, Meagher & Flom LLP, Los Angeles, California; Jennifer H. Berman and Eric J. Gorman, Skadden, Arps, Slate, Meagher & Flom LLP, Chicago, Illinois; Jonathan Fombonne, Sarah Grossnickle, and Noelle M. Reed, Skadden, Arps, Slate, Meagher & Flom LLP, Houston, Texas; Joseph M. Sandman, Skadden, Arps, Slate, Meagher & Flom LLP, Washington, D.C.; Aaron Morris, Immigration Equality, New York, New York; Virginia M. Goggin, New York City Gay and Lesbian Anti-Violence Project, New York, New York; Glenn Magpantay, The National Queer Asian Pacific Islander Alliance, New York, New York; for Amici Curiae Immigration Equality, New York City Gay and Lesbian Anti-Violence Project, and National Queer Asian Pacific Islander Alliance.

Lynn Lincoln Sarko, Alison S. Gaffney, Derek W. Loeser, Amy Williams-Derry, and Tana Lin, Keller Rohrback L.L.P., Seattle, Washington; La Rond Baker and Emily Chiang, American Civil Liberties Union of Washington Foundation, Seattle, Washington; Laurie B. Ashton, Keller Rohrback L.L.P., Phoenix, Arizona; Alison Chase, Keller Rohrback L.L.P., Santa Barbara, California; for Amici Curiae Joseph Doe, James Doe, and the Episcopal Diocese of Olympia.

Patricia S. Rose, Seattle, Washington, for Amici Curiae One Million Kids for Equality and African Human Rights Coalition.